**STATE OF MARYLAND, For the Use of Anne A. MITCHELL, Surviving Spouse of Berton S. Mitchell, deceased, et al., Plaintiffs,**

v.

**CAPITAL AIRLINES, INC., Vickers-Armstrongs, Limited, etc., Defendants.**

United States District Court
S. D. New York.
Nov. 11, 1961.

Speiser, Quinn & O'Brien, by Edward M. O'Brien, New York City, for plaintiffs, Mitchell, Smith, Brophy, Kinkade, Boatright, Potish, Gittinger, Mannix, Jackson and Reed; Jules M. Goldstein, New York City, of counsel.

Mudge, Stern, Baldwin & Todd, New York City, for plaintiff Bouchard; by Donald J. Zoeller, New York City, of counsel.

Higgins & Latto, New York City, for plaintiffs G. C. Cleary and M. D. Cleary; by John V. Higgins, New York City, of counsel.

Theodore E. Wolcott, New York City, for plaintiffs Griffith, Logan, Pollard, Weinstein and Davis.

Haight, Gardner, Poor & Havens, New York City, for defendants Vickers-Armstrongs, Limited, Vickers-Armstrongs, (Aircraft) Limited, Vickers-Armstrongs, Inc.; by William J. Junkerman, L. Anthony Zega, New York City, of counsel.

THOMAS F. MURPHY, District Judge.

These 22 actions arise out of the crash of a Viscount airplane near Chase, Maryland, in May 1959. The plane was owned and operated by Capital Airlines, Inc. (hereafter Capital) and was on a regularly scheduled flight between New York City and Atlanta, Georgia. All aboard perished. These actions for wrongful death under the laws of Maryland followed (the first of the 22 being instituted in this court in August, 1959). Jurisdiction is based on diversity of citizenship. Defendants Capital and Vickers-Armstrongs, Incorporated (hereafter Incorporated) appeared and answered.

Defendants Vickers-Armstrongs, Limited (hereafter Limited) and Vickers-Armstrongs, (Aircraft) Limited (hereafter Aircraft) brought on the instant motions under Rule 12 of the Federal Civil Rules, 28 U.S.C., for an order—

1. Quashing the purported service upon them of the summons and complaint herein and dismissing the complaint against them upon the grounds (a) that the defendants are corporations organized and existing under the laws of Great Britain and Northern Ireland, are not present within this jurisdiction, and are not subject to the jurisdiction of this court; and (b) that they have not been served with process herein for the reason that copies of the summons and complaint have not been delivered to any officer, director or managing agent, or to any other agent authorized to receive service of process on their behalf; or in the alternative, (2) dismissing the complaints as against them upon the ground that they are not doing business in this district, and that as to them venue is improperly laid in this district.

The parties in all of the related cases pending in this court have agreed to be bound by our ruling on these motions to dismiss. Interrogatories, depositions and admissions were filed on this issue and form the basis of our findings.

The questions raised by the moving defendants involve the recurring problem of attempting to determine empirically from the peculiar facts of the case whether an artificial, intangible and abstract creature of the law is amenable to the judicial jurisdiction of the court, *in personam*. The problem has been discussed *ad nauseum*, and has produced an abundance of confusion involving the terms, "presence," "found," "doing business" and "reasonableness." We do not profess to have devised any easy method of dissipating the confusion or for making resolution of the question less burdensome, but we are attracted to a fresh approach to the problem insofar as suits of the instant kind, between United States citizens and alien corporations, are concerned. See Green, Federal Jurisdiction in Personam of Corporations and Due Process, 14 Vanderbilt L.Rev., 967 (1961).

There is not present here any question of notice of these suits to the movants, nor of the subject matter jurisdiction of the court. And the claim of undue in-

convenience in defending these actions rests upon the possibility that defendants may be required to transport some of their employees here from England as witnesses upon the trial, and negatives the existence of a convenient forum any place in this country. In that respect defendants' situation is the same as that with which plaintiffs would have to contend if they were required to litigate their claims against these alien defendants in England. So essentially, there is involved the question of the moving defendants amenability to the judicial power of the United States Courts, this one in particular.

While defendants press alternate grounds for dismissal, viz., defect of personal jurisdiction and venue, and contend that a finding of their "doing business" in this district is essential to defeat their motion *in toto,* we find that no proper objection can be raised by them as to venue and that the facts which spell out personal jurisdiction over them likewise bring them within the reach of process.

■■ To satisfy venue in these diversity actions, each must be brought in the district where all plaintiffs reside or in the district where all defendants reside. 28 U.S.C. § 1391(a). No objection as to venue is made by Capital or by Incorporated, because as to them venue is proper. The moving defendants are alien corporations, and as such have no residence in this country and by the express terms of 28 U.S.C. § 1391(d) are suable in any district. See, 1 Moore's Fed.Prac., ¶ 0.142 [6] pp. 1508–1513 (2d Ed., 1960); Barrow S. S. Co. v. Kane, 170 U.S. 100, 112, 18 S.Ct. 526, 42 L.Ed. 964; Bator v. Boosey & Hawkes, Ltd., 80 F.Supp. 294, 296 (S.D.N.Y., 1948).

■ Accordingly, defendants may be sued in any district where valid service can be effected so long as there exists personal jurisdiction over them, and that depends upon whether the movants have certain minimum contacts with this country and district to warrant the assertion of the federal judicial power over the controversies to the extent that under traditional notions of fair play they ought to be personally amenable to that judicial power, and that a judgment *in personam* against them will be accorded full faith and credit in those jurisdictions where such traditional notions of fair play obtain. Whether the contacts need amount to "doing business" or may be something less (cf. McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223) we need not debate. The contacts of those business corporations are in any event business contacts, and (upon the facts hereafter detailed) we are satisfied that their quality and quantity suffice to hold defendants have personally subjected themselves to the jurisdiction, and further, in this context that the persons whose activities in this state form the predicate for concluding as we do, are *pro hoc vice,* the managing agents of defendants for service of process. Cf. Bomze v. Nardis Sportswear, Inc., 165 F.2d 33, 37 (2d Cir., 1948). Those persons are, Christopher Clarkson, upon whom process was in fact served, and who well may be called defendants' general agent, and the subsidiary, Incorporated, which too, we consider to be defendants' agent. By virtue of the activities of those two, at least in combination, the movants may be deemed to be present in this jurisdiction even under the test they contend for, that of "doing business."

■ Limited, organized under the laws of Great Britain and Northern Ireland in 1927, has its registered offices in England. Up to March 11, 1955, it was the sole manufacturer and seller of Viscount airplanes. All manufacturing was and is carried on at Weybridge, Surrey, England. Christopher Clarkson is a British subject residing in New York City since 1952. In that year he began his employment with Limited, at first, part-time, and by 1954 as its sole United States representative whose principal duties involved the sale and promotion of Viscount aircraft in this country. Clarkson was the first to contact defendant Capital during 1952 and 1953 regarding the sale to Capital of Viscounts manufactured by Limited. He attended negotiations with respect thereto, some of which were in

London, though, he says, not as an active participant. In June, 1954, Capital entered into a contract with Limited for the purchase of three Viscounts (at approximately $1 million each) with an option to Capital to buy 37 additional Viscounts. In August, 1954, Capital was given a further option to purchase an additional 20 such airplanes, making 60 in all. The options were exercised by Capital and all agreements were reduced to a single contract dated April 15, 1955, between Limited and Capital. This contract provided that Limited would, at the request of Capital, provide and maintain within the United States for a period of ten years, supplies of spare parts sufficient to ensure satisfactory operation of the Viscount aircraft Capital was to purchase. The original contract with the option for the 37 Viscounts had a similar provision as to spare parts. In December, 1954, Limited leased warehouse space from Capital in Virginia to be used for the storage of spare parts.

In January, 1955, Limited organized Incorporated under the laws of Delaware with capital stock of $1,000. Incorporated has its principal place of business in Virginia and is authorized to do business in New York. The business of Incorporated primarily is to supply after-sales-service and spare parts to Viscount operators in this country. It is the sole and exclusive agency and distributor of spare parts for Viscounts in the United States. On January 11, 1955, Incorporated's Board of Directors authorized the company officers to substitute Incorporated for Limited in the warehouse agreement with Capital. That was done, and in January, 1956, Incorporated was authorized by its board to enter into a ten year lease of Capital's warehouse in Virginia.

In December, 1954, Limited organized Aircraft to which it transferred all of its manufacturing and selling functions. (Up to this time Limited had delivered only three of the contracted-for Viscounts to Capital). In January, 1956, Limited, Aircraft and Capital entered into an agreement whereunder Aircraft was substituted in the place and stead of Limited and assumed the obligations of Limited under the contracts with Capital, and the latter released Limited thereunder. This agreement was back-dated to be effective as of June, 1955. Christopher Clarkson, who was named by Limited as a director of Incorporated, and has continued to date as a director, became the sole United States representative of Aircraft as he had been for Limited, upon the formation of Aircraft. His duties remained the same.

The plane that crashed in this case was manufactured by Aircraft in 1957 and delivered to Capital in England in 1958. Actually, it was flown to the United States "for the account of Capital," technical legal title passing in England. After delivery of Viscounts to Capital under the contracts, Aircraft, directly, neither modified, tested, inspected, repaired nor serviced such aircraft at any time, notwithstanding its warranties incident to the sales.

Aircraft did send at least ten field-service engineers to the United States, including one, R. H. Botterill, all of whom were assigned to Incorporated, the latter, as we said before, being the exclusive after-sales-service agent of Aircraft. Botterill had been employed by Limited and then joined Aircraft upon its formation in December, 1954. He became (and remains to date) a director of Incorporated and then, in March 1956, became its general manager and then Executive Vice President in 1958, in complete charge of all operations of Incorporated. In December, 1959, subsequent to the institution of the first of these actions, he returned to England to the offices of Aircraft where he now serves as Service Controller, in which capacity he receives all reports from Incorporated regarding after-sales-servicing of Viscount aircraft. While here, Botterill and the group of field service engineers, working through Incorporated, gave technical advice to American operators of Viscounts on behalf of Aircraft under the latter's contract of sale with such operators.

Incorporated sells spare parts to Viscount operators both in this country and abroad, all of which it imports from Aircraft in England. (As we understand it there are certain manufacturers in England of non-airframe parts, other than Aircraft, to whom and from whom Incorporated buys and sells parts which ultimately go into the Viscount airplane either at Aircraft's plant in England or as installed by Viscount operators in this country). Incorporated also sells certain Viscount parts that may be fitted, nonetheless, to non-Viscount planes. In addition, Incorporated purchases from American manufacturers certain parts and products which it exports to Aircraft (22 of such manufacturers are located in New York City).

Incorporated's sales income ranges between $4 and $7 million a year. It manufactures no parts itself and has no repair shops. It has only storage facilities and office space. *It Has No Sales Force At All.*

The financing of Incorporated is illuminating. Between 1955 and 1959 Incorporated "borrowed" from Limited some $10 million, without written agreements, notes, security or memorandum covering any such loans. The loans were to be repaid at the earliest possible moment, with interest, which, incidentally, resulted in considerable tax reductions for Incorporated. The arrangement was one of a revolving fund type whereunder Aircraft (wholly owned by Limited) would sell parts to Incorporated for resale to Viscount operators; Limited would make payment for such parts directly to Aircraft and then set up a loan on its books to Incorporated. Limited paid its wholly owned and controlled subsidiary for the debts of its wholly owned and controlled subsidiary. This financing arrangement was worked out by Incorporated's Secretary-Treasurer on the one hand, and Messrs. Rapp (a director of Aircraft, Limited and Incorporated) and Robbie (a director of Aircraft and Limited) on the other hand.

The first year, Incorporated received $2¼ million in parts from Aircraft, and Limited "loaned" Incorporated about the same amount that year. Incorporated's profit, after taxes, for the first five years was $140,000, and the total of loans during that period was $10 million. Incorporated still owes Limited between $2 and $3 million. And there of course have been no dividends declared since its organization.

Clarkson has maintained offices in Rockefeller Plaza since the summer of 1954, prior to the organization of Aircraft. The lease is in his own name though all expenses therefor are paid by Aircraft. The 1956 lease agreement provided that the offices were to be used "solely for Executive Offices of the United States representative of Vickers Armstrongs Limited of London, engineers and manufacturers of ships, aircraft machinery and other products * * *." His contract of employment in very broad language, provides in substance that he shall serve Aircraft and act as directed by Aircraft, and that he will conform to all reasonable instructions that may be given him from time to time by the Board of Aircraft, and that he will devote the whole of his time and attention to the performance of his duties. In paragraph 5 of this agreement the term "Service" is defined as "Continuous whole-time service on the staff of Vickers-Armstrongs Limited and/or V–A (Aircraft)."

Clarkson has been, since its inception, a director of Incorporated, and is supposed also to be a sales representative for Incorporated under a written contract which provides for commissions to him based on the orders for aircraft parts he promotes, and upon the purchase of parts for any aircraft in whose sale he was or may have been instrumental as representative of Aircraft or Limited. He concededly never received a single order for spare parts and does not in fact solicit orders or undertake sales promotion of spare parts. He could not remember a single instance of the offices he maintains being used to transmit Incorporated's business. Although he admittedly does nothing to promote Incorporated's sales, he nevertheless receives commissions on

*all* sales by Incorporated of spare parts. Plaintiffs contend without contradiction that such commissions must necessarily be on account of his being instrumental in the sale of the airplanes for which the parts are purchased, as representative of Limited or Aircraft. Defendants do say that it is unwarranted to call such commissions additional compensation to Clarkson for his services with respect to the sale of Viscounts.

Clarkson is paid a salary by Aircraft of $40,000 per annum with an additional $12,000 to run the New York office. He is also reimbursed for his expenses for travel, entertainment and cablegrams while he is out of New York. Business expenses paid to Clarkson, and taken by Aircraft as tax deductions, amounted to approximately $30,000 a year between 1955 and 1959. The monies for his business expenditures are deposited by Aircraft in a New York City bank account in Clarkson's name.

Representatives of Aircraft, while in New York, have made use of the office of Clarkson, and officials of the Sales, Contracts and Engineering Departments of Aircraft have telephone credit cards which result in billings to the Clarkson office number. The office is equipped with a teletype machine also, providing a direct line to England. With the general design to assist the sale of Viscount planes, Clarkson is sent materials, information and leads. He is furnished with all the necessary documents relevant to a prospective customer's consideration of whether to buy or not to buy the Viscount. He visited every airline he could in the New York area in endeavoring to promote the sale of such aircraft. He attends sales conferences and travels to England on Aircraft's business, and he keeps Aircraft advised as to the developments in American aviation industry and the needs of operators in this country. He obtains credit information on American buyers and financial reports on airlines at the request of Aircraft. Negotiations were conducted in this country between Aircraft and TWA extending over a period of some nine months. No

sales resulted therefrom, but in the course of negotiations a number of Aircraft officials came to the United States and attended conferences, some of which took place in New York City. Clarkson also attended at these negotiations, though in a minor non-negotiating part he testified. He was instrumental in Aircraft's sale of a Viscount airplane to Union Carbide, located in New York City, and during the negotiations, again, some of Aircraft's officials came to New York City. Aircraft sold spare parts to Grumman on Long Island, though defendants emphasize that the orders were received in England and deliveries made there.

All airplanes, equipment, parts, etc., sold to Capital were covered by chattel mortgages filed in New York City, and by their terms, governed according to the law of New York (counsel was most familiar with New York law). All aircraft were to be used only within the United States on the certificated routes of Capital. Limited maintained an account in the Chase Manhattan Bank in New York City for the receipt of certain monies from Capital under the mortgage agreements.

These defendants contracted to, and did sell approximately $160 million worth of Viscounts in North America, $100 million thereof to United States operators (representing 25% of the total number of Viscounts sold throughout the world) and of that figure $60 million worth to Capital and $10 million to Northeast Airlines, Inc., both of whom operate regularly in and out of New York airports.

The sale of spare parts in multi-million dollar amounts, through the instrumentality of Incorporated, was the plainly foreseeable and consequent business in this country by those defendants as required under their contracts for the sale of the planes. Their actual doing of such business cannot be gainsaid by adverting to the niceties of the law of sales and contracts. For instance, defendants emphasize that the contracts with Capital were executed or signed in England (two of the four contracts were executed by Capital in Washington, D. C.), by their terms

were to be governed by the laws of England, the planes were "delivered" in England, all notes were payable in England, and Capital submitted to the jurisdiction of the English courts for purposes of suit under the contracts. (We note, however, that Limited has recently instituted suit under the contracts in this court against Capital, for itself, Aircraft and another, for some $33 million). Aside from the sale of spare parts, Incorporated performed the complementary function of purchasing substantial amounts of materials in this country for export to defendants in England for use in the manufacturing operations there.

Prior to the formation of Incorporated and Aircraft, the manufacturing and selling of airplanes, and the sale of spare parts and rendering of after-sales-services, were conducted by separate departments of Limited. We perceive nothing more than the most formal differences in the operations during the relevant times herein involved.

Considering the activities of Incorporated, essentially carrying out the obligations of Limited and Aircraft under their contracts with American operators, and acting as sales and purchasing agent for them, irrespective of the bald assertions by defendants that there exists no basis in fact for the appellations, and the continuous and substantial activities of Clarkson whose contract is so general as to induce us to believe that he is in fact a general agent for defendants, at least when the entire ball of wax is viewed as a whole, we are constrained to hold that Limited and Aircraft are in fact "doing business" in this state to the extent that they may be personally subjected to these suits. Certainly, that "something less" called minimum contacts is satisfied.

When we consider the quantum of business these defendants have done in the relevant times here involved with American customers, and the quality and nature of their wares, the sale of which is quite dissimilar than the run of the mill sale of most other commodities, cf. MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832, 833 (2d Cir., 1958), and involving long lasting effects, we can conceive of no other conclusion than that which we reach under the circumstances.

The motions are denied in all respects.

These are orders. No settlements are necessary.