JAPAN GAS LIGHTER ASSOCIATION, Kanamaru Shoten, Ltd., and Japan Gas Lighter Corp., Plaintiffs,

v.

RONSON CORPORATION and LaNationale, S. A., Defendants.

Civ. A. No. 721–65.

United States District Court
D. New Jersey.

July 15, 1966.

Carpenter, Bennett & Morrissey, by Stanley Weiss, Newark, N. J., for plaintiffs; Stitt & Hemmendinger, Washington, D. C., by Noel Hemmendinger, Washington, D. C., Semmes & Semmes, Washington, D. C., by David H. Semmes, of counsel.

Shanley & Fisher, by David S. Cramp, Newark, N. J., for defendant Ronson; Pennie, Edmonds, Morton, Taylor & Adams, New York City, by Frank F. Scheck, New York City, of counsel.

Stryker, Tams & Dill, by Walter F. Waldau, Newark, N. J., for defendant LaNationale.

## OPINION

COOLAHAN, District Judge:

I. These motions arise from an action brought by plaintiffs for a declaratory judgment of patent invalidity and non-infringement. The plaintiffs are the Japan Gas Lighter Association [Association], a group of forty-one Japanese manufacturers formed to market lighters; Kanamaru Shoten Ltd., an individual member of the Association; and Japan Gas Lighter Corporation [Lighter Corp.] an American subsidiary of the Association established to import and sell lighters in this country.

The patents challenged in this suit, U. S. Patents Nos. RE 24,163 and 2,882,- 940 [sometimes known as the "Zellweger Patents"] are owned by defendant LaNationale, S.A. [Nationale], a Swiss Corporation with its principal place of business in Geneva. In January of 1956, these patents, along with others, were licensed to the defendant Ronson Corporation, a New Jersey corporation with its principal place of business in this State. The two patents in suit relate to a valve structure used to refill the lighters which is discussed more fully below.

Plaintiffs allege an actual controversy has resulted from claims made by Ronson about the scope of these patents and about their infringement. Plaintiffs further allege that this controversy has wrongfully hindered their attempts to market, in this country, lighters incorporating the Association's own patent on filler valve construction, U. S. No. 3,192,971 [sometimes known as the "Kanamaru Patent"].

Plaintiffs seek a determination that the Zellweger Patents are invalid and that they are not infringed by the Association's valve.

Subject matter jurisdiction arises under the Patent Laws of the United States, 28 U.S.C. § 1338 and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Venue is predicated on 28 U.S.C. § 1391(c) and (d), and personal jurisdiction on Rule 4(e), Federal Rules of Civil Procedure, and Rule 4:4–4(d), New Jersey Rules of Civil Practice.

Before filing answers to the Complaint, defendants brought the four motions now before the Court:

1) Nationale moves to quash the service and dismiss the complaint as to itself on the ground that it cannot properly be sued within the jurisdiction of this Court.

2) On the assumption Nationale is dismissed, Ronson moves to strike the remainder of the Complaint for failure to join an indispensable party.

3) Ronson moves to dismiss for failure to state a claim upon which relief can be granted.

4) In the alternative, Ronson moves for summary judgment.

The defendants also seek a stay of their depositions being taken. The four motions are considered in turn.

## MOTION TO QUASH SERVICE AND DISMISS NATIONALE.

II. Nationale's motion to dismiss challenges "the jurisdiction" of this Court to entertain the suit against it. The thrust of its argument is that under the circumstances alleged only the District Court for the District of Columbia may hear

the matter. However, the briefs and oral argument make clear that, in fact, both the ground of improper venue and that of defective personal jurisdiction have been raised and, unfortunately, confused. Therefore, though the ground is well trodden, a brief review of the several facets of "jurisdiction" is useful.

■ To issue a valid binding judgment this Court must establish both Federal jurisdiction over the subject matter and personal jurisdiction over the defendant. Additionally, the plaintiff must have properly served his adversary with process and have laid venue in a proper District. Chassis-Trak v. Federated Purchases, Inc. 179 F.Supp. 780, 786 (D.N.J., 1960).

■ Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication. Service of process is the corrollary requirement which sets the Court's personal juridiction in gear. That is, someone amenable to the assertion of jurisdiction cannot be subject to its exercise until he has been properly served. Both that assertion of power and the subsequent service must be statutorily and constitutionally permissible. Due process requires certain ties or contacts between a foreign defendant and the forum which asserts jurisdiction, Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); and service reasonably calculated to notify him of the proceeding and afford him an opportunity to appear and be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

■ Subject matter jurisdiction deals with the Court's competence to hear a particular category of cases. In the present matter, no question of subject matter jurisdiction has been raised. [Hereinafter, unless otherwise noted, the term "jurisdiction" refers to jurisdiction over the person.]

Similarly, the sufficiency of the notice, per se, has not been disputed. After attempts to serve Nationale personally within the District proved fruitless, service was made in Switzerland by registered mail on September 20, 1965. The issue raised in regard to that service pertains to the method employed, rather than to the question of actual notice. See, infra pp. 229–236.

■■ Venue also limits the forums available to the plaintiff. However, it is a doctrine of convenience, not of constitutional jurisdiction. 1 Moore, Federal Practice, 1317 (2d Ed., 1960); Hart and Wechsler, the Federal Courts and the Federal System, 949–951 (1953). Venue deals with the locality of the suit, that is, with the question of which Court, or Courts, of those that possess adequate personal and subject matter jurisdiction may hear the specific suit in question.

■ The concepts of personal jurisdiction and of venue are closely related, but nonetheless distinct. Olberding v. Illinois Central R. R. Co., 346 U.S. 338, 74 S.Ct. 83, 98 L.Ed. 39 (1953); Polizzi v. Cowles Magazine, Inc., 345 U.S. 663, 73 S.Ct. 900, 97 L.Ed. 1331 (1953).[1] The

1. A major source of confusion is the fact that venue, as a personal privilege of convenience, may be constructively waived by the defendant. Thus, where a corporate defendant has complied with a State statute requiring appointment of an agent within the State to receive process as a condition of doing business therein, the appointment is deemed a consent to be sued in that State which constitutes a waiver of the venue privilege. Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167 (1939). Therefore, where such an appointment has been made, the question of proper venue is frequently discussed in terms of the defendant's amenability to service in that State, although such service is also necessary for the constitutional assertion of the judicial power over the defendant. Vogel v. Crown Cork & Seal Co., 36 F.Supp. 74 (D. Md., 1940).

The confusion is compounded by inaccurate references to "venue jurisdiction" throughout the cases and commentaries, and by general usage of the term "jurisdiction" to subsume the questions of subject matter jurisdiction, personal jurisdiction, sufficiency of service, and venue.

distinction between venue and personal jurisdiction is important precisely because often several district courts are competent to hear the matter, and can assert jurisdiction over the defendant; venue then is decisive as to where the suit may be brought.[2] Nationale's blurring of this distinction has impaired its analysis of both requirements.

██ *Venue*—The plaintiffs rely on the general venue statute, 28 U.S.C. § 1391. Since Nationale is an alien corporation, venue is proper for it in any district by virtue of the express terms of Subsection 1391(d).[3]

██ When an alien and a non-alien are joined as defendants, venue for the entire action is proper in any district where it is correct as to the non-alien defendant, State of Maryland For Use of Mitchell v. Capital Airlines, Inc., 199 F. Supp. 335, 337 (S.D.N.Y.1961;) Ronson has not challenged the venue. Of course, the alien defendant still is afforded some protection with regard to the fairness of locale by the requirements of constitutional jurisdiction and service; and this is true whether Nationale is sued singly or jointly. Ibid.

Since these latter requirements rather than venue become the operative constraints upon suing aliens, the two tests are sometimes telescoped in the earlier decisions into the conclusion that "venue

for an alien is proper in any district in which he can be sued." e. g., Vaughan v. Empresas Hondurenas, S.A., 171 F.2d 46, 47 (5th Cir. 1948.) Whatever the accuracy of this characterization before the adoption of § 1391(d), that provision clearly states the present rule for aliens in regard to venue as distinct from personal jurisdiction, namely, that venue is proper anywhere.

In addition to the general venue provision of 28 U.S.C. §§ 1391–1393, other statutes provide special venue limitations for particular types of actions. Some of these are collected in Chapter 87 of Title 28 U.S.C., while others are collocated with the statutory actions to which they pertain in other Titles of the Code.

One of these special statutes, Subsection (b) of 28 U.S.C. § 1400 provides:

"Any civil action for patent infringement may be brought in the judicial district where the defendant resides, *or* where the defendant has committed acts of infringement *and* has a regular and established place of business." [Emphasis added].

In Fourco Glass v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), the Supreme Court ruled that § 1400(b) is the exclusive venue provision for patent infringement suits and is not modified or supplemented by the expansive definition of corporate

---

See the excellent discussion in Carter v. American Bus Lines, 169 F.Supp. 460 (D.Neb.1959); and see the complaint, para. 5 in this lawsuit.

2. The legislative decision that in specified classes of litigation a few fora are particularly convenient or otherwise appropriate, assumes that other fora at least have the requisite jurisdiction to hear the matter. For example, when this Court lacks personal jurisdiction, it is powerless as to that defendant and must dismiss. But if only venue is defective, it may still transfer the action to a district where venue is proper "if it be in the interest of justice." 28 U.S.C. § 1406(a). Such transferral assumes initial jurisdiction over the parties though venue is lacking.

3. "An alien may be sued in any district." Since venue concerns locality and convenience, the basis provisions are geared to residence. They provide for venue in Federal question cases where all defendants reside, § 1391(b); and then expansively define residence for venue purposes in the case of corporate defendants, § 1391(c). Subsection 1391(d) was added in 1948 to codify the prevailing case law that since an alien was a resident of the judicial district, the venue restrictions based thereon did not apply. See Reviser's Note, Judicial Code Revision, 1948; 1 Moore Federal Practice ¶0.142(6), (2nd Ed. 1960) [and cases cited therein].

"residence" in the general venue statute. n. 4.[4]

The *Fourco* decision has been cited for the broader proposition that whenever a general venue statute and a special venue provision both apply to the circumstances, the special provision supercedes the general one because it presumably was designed to deal with that particular class of litigation. Leith v. Oil Transport Co., 321 F.2d 591 (3rd Cir. 1963); Roberts Brothers Inc. v. Kurtz Bros., 231 F.Supp. 163 (D.N.J., 1964).

Relying on this doctrine, Nationale contends that special venue statutes covering this lawsuit preclude the plaintiff's use of the general venue provisions §§ 1391(c) and 1391(d).

It relies primarily on Section 293, Title 35 U.S.C., to be dealt with presently. However, it also appears to suggest that under the *Fourco* decision, Section 1400 (b) of Title 28 itself forecloses laying venue here under the general statute. This argument, if earnestly pressed upon the Court, is without merit.[5]

In the first place, assuming, *arguendo*, that § 1400(b) did supercede § 1391 in this action, it is far from clear that venue in this district would be improper.[6] However, the Court need not reach this question, for it is well established that § 1400(b) is the exclusive venue provision for patent infringement suits only and does not pertain to declaratory judgment suits for decrees of invalidity and non-infringement.[7] Declaratory judgment actions under the patent laws are still governed by the general provisions of § 1391. General Tire & Rubber Co. v. Watkins, 326 F.2d 926 (4th Cir. 1964) cert. denied, 377 U.S. 909, 84 S.Ct. 1166, 12 L.Ed.2d 179 (1964); National Tool & Mfg. Co. v. Detroit Eng'r Co., 182 F.Supp. 529 (D.N.J.1960); Barber-Greene Co. v. Blaw Knox Co., 239 F.2d 774 (6th Cir. 1957); contra, Southern Textile Machinery v. Isley Hosiery Mills, 153 F.Supp. 119 (M.D.N.C., 1957).

Nationale's main contention is that another special statute, 35 U.S.C. § 293, requires that this lawsuit be brought in

4. Fourco, a West Virginia corporation, was sued in New York where it did business but had committed no acts of infringement. Plaintiff argued that the term "resides" in § 1400(b) was modified by the broad definition of corporate residence in § 1391(c) and therefore allowed suit wherever Fourco was doing business. The Court disagreed.

5. Section 1400(b) is first discussed merely as illustrating the *Fourco* doctrine of special venue. Defendant Nationale's Brief, pg. 6. But Nationale goes on to 1) emphasize that plaintiffs failed to plead it, 2) argue that § 1400(b) "*a fortiori*" supercedes § 1391(d)—an issue only relevant here and not raised in *Fourco*—and 3) urge that venue would be improper in this District under § 1400(b). Id. at pp. 6, 8.

6. If § 1400(b) did supercede § 1391, venue would still be correct as to Ronson under the first half of § 1400(b), since Ronson is an inhabitant of New Jersey. As for Nationale, the available evidence strongly indicates that *even under § 1400(b)*, venue as to alien defendants is still proper in any district.

The holding in Fourco was expressly based on the Court's conclusion from the Reviser's Note that § 1400(b) enacted its predecessor provision, 28 U.S.C. (1940 Ed.), § 109, without substantive change. 353 U.S. at 227, 77 S.Ct. 787. As the Court noted, venue practice under § 109 with regard to corporate residence clearly was narrower than that permissible under § 1391(c). And the prevailing rule under § 109 with regard to corporate residence was carried forward under the provisions of § 1400(b). But the prevailing rule under § 109 was equally clear that alien corporations could be sued in any district. United Shoe Machinery Co. v. Deplessis Independent Shoe Machinery Co., 133 F. 930 (C.C.A., Mass.1904); Sandusky Foundry & Machine Co. v. De Levaud, 251 F. 631 (N.D.Ohio, 1918). Thus, if anything, the *Fourco* case suggests that even under § 1400(b), the prior case law that aliens could be sued anywhere insofar as venue was concerned remains valid. Accord, 1 Moore Federal Practice, 1510, n. 7.

7. The narrow scope of § 1400(b) is indicated on its face. Compare the limitation to "actions for patent infringement" with the broad applicability of § 1400(a) to all "civil actions, suits or proceedings * * * relating to copyrights." De Luxe Game Corp. v. Wonder Products Co., 157 F.Supp. 696 (S.D.N.Y.1957).

the District Court for the District of Columbia. Section 293 provides:

"Every patentee not resident in the United States may file with the Patent Office a written designation stating the name and address of a person residing in the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder. If the person designated cannot be found in the address given in the last designation, or if no person has been designated, the United States District Court for the District of Columbia *shall have jurisdiction* and summons shall be served by publication or otherwise as the court directs. The court shall have *the same jurisdiction* to take any action respecting the patent or rights thereunder that it would have *if the patentee were personally within the jurisdiction of the court."* [Emphasis added.]

Nationale's use of Section 293 is double-barreled; it treats the provision almost interchangeably in terms of both venue and personal jurisdiction.

The crux of its theory in regard to venue is this: Since § 293 is a special venue provision designed precisely for situations such as the one at bar, it supercedes the general venue statute under the aforesaid *Fourco* doctrine. And, venue is improper in this District under § 293 since Nationale has not designated an agent in New Jersey.[8]

 The short answer to this argument is that § 293 does not supercede the general venue statute because it is not a special venue provision. Rather, it pro-

vides a method for invoking the Court's personal jurisdiction over foreign defendants by effecting service upon them outside the United States. In this sense it is, in effect, a federal "long-arm" statute, whose constitutionality is premised on the District of Columbia situs of a United States patent.

The provision is not happily worded, and Nationale's attempted interpretation is understandable. But neither the language of the provision, nor its legislative history, nor the cases under it, on close examination, indicate that it pertains to special venue, let alone that it confers exclusive venue of the District of Columbia for the present action. They suggest the contrary.

As for the language itself, Nationale views the general authorization that the District of Columbia "shall have jurisdiction" as a mandate limiting venue to that district (if no agent has been appointed elsewhere). However, alternative fora may be available to plaintiff precisely because several of them have jurisdiction to hear the matter and bind the parties. supra p. 224. That phrase "shall have jurisdiction" is characteristically used to delineate such jurisdiction, rather than venue. Where Congress seeks to limit venue to a particular forum, including that of the District of Columbia, it usually does so by explicit reference to the institution of the lawsuit not by indirect reference to the Court's authority to exercise its power.[9] True, Congress' choice of language is not always so fortunate; where reference to jurisdiction would otherwise be meaningless, it has on occasion been deemed an inapt

8. "Section 293 and only Section 293 is the statutory authority for venue jurisdiction with respect to Nationale, S.A. * * * in the case at bar. It is a specific statute and therefore supercedes all other statutory provisions which are alleged or herein referred to." Brief of Nationale, S.A., p. 10. "By its precise provisions, this Court does not have venue jurisdiction, with respect to Nationale, S.A. * * * Congress, under 35 U.S.C. 293 has specifically provided for the District of Columbia as the proper venue

jurisdiction." Brief for Nationale, S.A., pp. 8, 10, 12.

9. In the case of patent litigation, compare Title 28 U.S.C. §§ 1338 (subject matter jurisdiction) 1400(b) (venue), and 1694 (process). Compare generally Title 28 U.S.C. Chapters 85 Jurisdiction, and 113–Process, with Chapter 87–Venue. In Chapter 87, for example, exclusive venue is indicated by such terms as "may be prosecuted in", "may only be prosecuted in", "may only be brought in", "shall only be brought in", etc.

limitation on venue.[10] In the case of Section 293, however, the last sentence strongly indicates that the reference to the jurisdiction of the District of Columbia is concerned with the problem of supporting personal jurisdiction over a foreign defendant:

"The court *shall have the same jurisdiction* to take any action respecting the patents or rights thereunder that it would have *if the patentee were personally within the jurisdiction of the court.*" [Emphasis added.]

The legislative history of Section 293 confirms this interpretation. The enactment is a recent one; it was adopted during the 1952 recodification of the patent laws. The Reviser's Note merely states that "this section provides for service of process on non-resident patentees." However, the Senate Judiciary Committee Report amplifies its purpose:

"Section 293 is a new section that is *needed on some occasions to obtain jurisdiction over foreign patent owners* that do not reside in the United States." Introductory Statement, Sen. Rep. No. 1979 (to accompany H.R. 7794), 82 Cong., 2nd Sess. (1952), U. S. Code Congressional and Administrative News 1952, p. 2394. (Emphasis added.)

In other words, it is a remedial provision designed to assist a plaintiff by producing an alternative avenue to obtain personal jurisdiction and service where it would otherwise be difficult or impossible. There is no indication in the history that it was designed to benefit the defendant by restricting venue.

It may have been assumed that the District of Columbia would normally be the only forum available in which to sue a non-resident patentee bent on avoiding litigation in America. For as noted previously, since venue for aliens after the 1948 Code revision is proper in any district, obtaining personal jurisdiction and service are the operative restraints on plaintiff choice of district. If a non-resident patentee neither appointed an agent to receive service, nor has sufficient contacts with any other district, use of § 293 would be essential to obtain any adjudication of rights under his patent. But it is quite another matter to misconstrue Section 293 as a restrictive venue provision, and, as a consequence, to misapply the Fourco doctrine as *Nationale* has done here.

There are few cases purporting to interpret this section.[11] In Establissements Henry Le Paute v. American Grenier Electronics, 172 F.Supp. 228, (D. Conn., 1959), the section was considered solely in terms of jurisdiction over the defendant, but the question of exclusive forum was not discussed.

The case of North Branch Products, Inc. v. Fisher, 179 F.Supp. 843, (D.D.C. 1960) sheds some light on our problem, though not for the reason suggested by the plaintiffs.[12] In declining to apply § 293 to the dispute before the Court,

---

10. For example, in the Jones Act, Section 20 (now 46 U.S.C. § 688) provides that when a seaman sues his employer "jurisdiction in such actions shall be under the court of the district in which the defendant employer resides * * *." In Panama R. Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924), the Supreme Court held that this phrase, while an extremely misleading use of the term "jurisdiction", had to refer to venue; the Court found this the only possible explanation since the District Courts already had admiralty subject matter jurisdiction, and no problem of personal jurisdiction was indicated.

11. Scandia House, Enterprises, Inc. v. Dam Things Establishment, 243 F.Supp. 450

(D.D.C.1965); Sealol Corp. v. Flexibox, Ltd., 242 F.Supp. 693 (D.D.C., 1965); and Webster-Chicago Corp. v. Holstensson, 132 F.Supp. 287 (D.D.C., 1955) all cite § 293 in support of the "jurisdiction" of the District of Columbia without analyzing it.

12. In *North Branch* Judge Holtzoff ultimately dismissed the suit on the grounds of *forum non conveniens.* Hence plaintiffs argue the consideration of alternative fora necessarily implied that the Court did not consider § 293 to give the District of Columbia exclusive authority to hear the matter. This reasoning is flawed by its premise. *Forum non conveniens* was invoked only after Judge Holtzoff had found § 293 totally inappli-

Judge Holtzoff found it limited to actions for infringement and declaratory judgment suits regarding infringement and validity. His conclusion in this regard was based on his view that if its application were not so limited, the constitutionality of the personal and subject matter jurisdiction of the Court would be questionable. 179 F.Supp. at 845.

 To summarize, venue as to Nationale was properly laid here under § 1391(c) and (d); Section 293 does not place exclusive venue in the District of Columbia under these or any other circumstances. Of course, if jurisdiction over the defendant cannot be asserted in this or any other district, as a practical matter Nationale would have to be sued in the District of Columbia by default. This, however, is a distinct question to which we now turn.

 *Jurisdiction*—Section 293 is also invoked to deny this Court's in personam jurisdiction over Nationale.[13] As

is normally the case in Federal litigation, challenge to that jurisdiction is made by way of an attack on the service of process.

The alias summons and complaint were served upon Nationale in Switzerland by registered mail, return receipt requested. Federal Rules 4(e) and 4(f) authorize service outside the State in which the District Court sits in any manner prescribed by State law.[14] Rule 4(i) sanctions this procedure even if the party must be served abroad.[15] Magnaflux Corp. v. Foerster, 223 F.Supp. 552 (N.D. Ill., 1963). Rule 4:4-4(d) of the New Jersey Superior Court provides that, subject to due process, a foreign corporation may be served by such receipted mailing at its principal place of business.[16]

Nationale attacks the service thus effected under Rule 4, F.R.C.P. and Rule 4:4-4(d) N.J.R.C.P. on three grounds:

1) That § 293, as a special statute applicable to these facts, supercedes the more general provisions of Rule 4(e)

---

cable to the instant dispute over title to the patent. He deemed this a contract action not "arising under the patent laws", and since there was neither Federal subject matter, nor (on the record) diversity jurisdiction, the action was temporarily entertained under the original jurisdiction of the District of Columbia District Court over local controversies arising within the Federal enclave of that District (D.C.Code, 1951, Title 11 § 306). The action was *then* dismissed on grounds of *forum non conveniens*.

13. While the Reply Brief purports to restate the argument in the main Brief which deals with venue, supra, the tack is changed at the outset to focus on service of process.

14. 4(e). "Whenever a statute of the United States or a court order thereunder provides for the service of a summons * * * upon a party not * * * to be found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons * * *

upon a party not * * * found within the state * * * service may * * * be made under the circumstances and in the manner prescribed by that statute or rule * * *."

4(f). "All process other than a subpoena may be served * * * when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state [in which the District Court is held]."

15. 4(i). "When the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not * * * found within the state * * * and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made: * * * (D) by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party served * * *."

16. R.R. 4:4-4(d). "(Personal Service) Upon a domestic or foreign corporation * * *, if service cannot be made upon any of the foregoing and the corporation is a foreign corporation, then subject to due process of law, by mailing the summons and complaint to * * * its principal place of business, or to its registered office."

by virtue of the canon of construction reaffirmed in *Fourco;*

2) That Rule 4(e) *itself* requires that service be made under § 293 rather than under a State statute;

3) "Alternatively, and regardless of the exclusiveness of 35 U.S.C. § 293 "Nationale does not have those minimum contacts with New Jersey which are necessary to assert jurisdiction over it with due process of law.

The first two grounds may be disposed of briefly. Under either theory of the relationship between § 293 and Rule 4, the practical result would be this: whenever a foreign patentee or his agent could not be found within this District, and service had to be made by mail or publication, process could issue only from the District Court of the District of Columbia.

Here, again, Nationale misapplies the *Fourco* decision. In *Fourco* the Court did follow the general canon of construction that "specific terms prevail over the general in the same or another statute which otherwise might be controlling." 353 U.S. at 228, 77 S.Ct. at 791, 1 L.Ed.2d 786. But this canon was not applied *in vacuo.* The Court had first ascertained that the original patent venue statute, re-enacted as § 1400(b), was specifically intended to constrict the prior broad patent venue which had been abused. Id., 224–228, 77 S.Ct. 787; Stonite Co. v. Melvin Lloyd, 315 U.S. 561, 62 S.Ct. 780, 86 L.Ed. 1026, (1942). The Court concluded from the analysis in *Stonite*, and subsequent legislative history that the special venue statute was not intended "to dovetail with the general provisions re-

lating to the venue of civil suits," but rather to independently control all infringement suits. 353 U.S. at 225, 77 S.Ct. at 790; and supra, p. 226 n. 5.

■ In the case of the service provisions of § 293 and Rule 4(e), the purpose was quite the contrary. Section 293 was designed to broaden a plaintiff's ability to bring foreign defendants within the reach of a Federal Court, supra, p. 227. Rule 4(e) clearly *was designed* "to dovetail" with past and future Federal process statutes. Indeed, it incorporates all of them by express reference. Unlike the separate venue statutes before the Court in *Fourco*, these two provisions do not conflict; they are to be read *in pari materia.* To suggest that such special statutes as § 293 must somehow "supercede the general provisions of Rule 4" is to nullify this express incorporation, and to distort the rationale of the *Fourco* holding.

The sequence of enactment must also be kept in mind. Rule 4(e) was not amended to permit service under State long arm statutes until 1963. Hence, in 1952 Section 293 was needed to effect service whenever the defendant could not be found within the State. With the amendment of Rule 4(e), it now is needed in fewer situations than before. Where the legislative intent is so clear, there is no basis for mechanically applying the aforesaid canon to narrow plaintiff's alternatives by precluding reference to the liberal service provisions of the Federal rules.[17] Moreover, even if the second half of Rule 4(e) referring to State law is considered separately and, incorrectly,

---

17. Cf., Latini v. R. M. Dubin Corp., 90 F.Supp. 212 (N.D.Ill., 1950), holding that the special process statute for patent infringement suits, 28 U.S.C. § 1694, did not preclude plaintiff's alternative reliance on Rule 4(d), F.R.C.P. Compare Leith v. Oil Transport Co., supra and Robert Bros. Inc. v. Kurtz Bros., supra, wherein the Third Circuit Court of Appeals and this District Court found the *Fourco* doctrine applicable to the Jones Act and Clayton Act, respectively. In

*Leith* the Court of Appeals simply found no basis in the Jones Act for departing from the canon followed in *Fourco*. But see Pure Oil Co. v. Suarez, 346 F.2d 890 (5th Cir. 1965); Hutchison v. Pacific-Atlantic S. S. Co., 217 F.2d 384 (9th Cir. 1954); Phillips v. Pope & Talbot, 102 F.Supp. 51 (S.D.N.Y.1952) [Jones Act], and Hoffman Motors Corp. v. Alfa Romeo, 244 F.Supp. 70 (S.D.N.Y.1965) [Clayton Act].

deemed in "conflict" with § 293, the Rule would prevail.[18]

Next, Nationale argues that even if Rule 4(e) is not superceded, its own terms require service under a Federal process statute rather than a State provision if the Federal statute is available.

This interpretation finds some slight support in Rule 4(e) on its face,[19] but is nonetheless erroneous. The background of the 1963 Amendments to the Rules, which added the second sentence, indicate that Rule 4(e) as amended was intended to present the plaintiff with the alternatives of proceeding along the State or Federal route.

First, it was assumed by the Supreme Court when the Amendments were promulgated, that State "long arm" statutes would apply to Federal question as well as diversity actions.[20] This was recently confirmed. United States v. First National City Bank, 379 U.S. 378, 381, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).

Second, the amendment was clearly adopted as a coordinate rather than a subordinate avenue of service. As the authoritative Advisory Committee Notes to the 1963 Amendments of the Federal Rules put it:

"If the circumstances of a particular case satisfy the applicable Federal law (first sentence Rule 4(e), as amended) and the applicable State law (second sentence), the party seeking to make service *may proceed under the Federal or the State law, at his option.*"

Note to Rule 4(e). [Emphasis added.][21]

Accord, Hoffman Motors Corp. v. Alfa Romeo, supra. [Service equally proper under the special process statute of the Robinson-Patman Act, 15 U.S.C. § 22, or the New York "long arm" statute via Rule 4(e).]

This option is also suggested by the Amendment's deletion of the words "shall be served" in the first sentence, and the substitution of "may be served." It parallels the option provided by Rules 4(d) (3) and 4(d) (7), of using State or Federal Statutes for service upon defendants found within the State in which the District Court is held. Gkiafis v. Steamship Yiosonas, 342 F.2d 546 (4th Cir. 1965).

Thus, service under Rule 4, F.R.C.P. in accordance with New Jersey Rule 4:4–4(d), was proper as long as the State rule may constitutionally be applied to these facts. This brings us to Nationale's last objection to the service made upon it, the alleged lack of due process.

The phrase "subject to due process of law" in the State Rule signifies New Jersey's assertion of extra-territorial jurisdiction to the furthest extent consonant with the Federal constitution's restraint upon that power. DeFazio v. Wright, 229 F.Supp. 111 (D.N.J.1964). We need not be delayed, therefore, by the threshold question of whether the service under R.R. 4:4–4(d) was statutorily—as distinct from constitutionally—permissible. That preliminary determination is

18. "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. 2072 [Enabling legislation, F.R. C.P.].

19. 4(e) authorizes service under "any statute of the United States or a court order thereunder", and adds that absent such provision service may be made "in a manner stated in this rule." The second sentence then authorizes service in accordance with State statutes. Thus, it might be argued that such State statutes are only to be used as a 1st resort if there is no Federal process statute which applies. Nationale's argument that "the

first sentence of Rule 4(e) limits the utility of State service," apparently follows this line of reasoning.

20. See Statement of Justices Black and Douglas, 374 U.S. 861, 869 (1963); Advisory Committee Notes on the 1963 Amendments to the Federal Rules of Civil Procedure, Rule 4(d), 4(e), and 4(f); 1 Barron & Holtzoff, Federal Practice and Procedure, #182.1 (1964 Supp.).

21. The Advisory Committee's Notes set forth "the background and purpose of the amendments." Report of the Judicial Conference of the United States, 31 F.R. D. 623 (1962).

only necessary when the State statute has stopped short of the outer constitutional limits on such service and requires even more involvement with the forum that is needed to satisfy due process.[22]

Insofar as due process is concerned, this Court's power to assert jurisdiction in a Federal question matter is tested, technically speaking, under the Fifth rather than the Fourteenth Amendment, Goldberg v. Mutual Readers League, Inc., 195 F.Supp. 778 (E.D.Pa. 1961); Lone Star Package Car Co. v. Baltimore & Ohio R. Co., 212 F.2d 147 (5th Cir. 1954). Nonetheless, the clearest guidance on when such jurisdiction is permissible is found in the Supreme Court's pronouncements on the corresponding power of State tribunals.[23]

In the last twenty years, these pronouncements have considerably widened the scope of permissible jurisdiction. This development, and its historical roots have been thoroughly reviewed by others and need not be repeated.[24] Mention need only be made of the three decisions which form the framework of that expansion: International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L. Ed. 95 (1945); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L. Ed.2d 1283 (1958). Together, these cases teach that the due process clause allows a test for jurisdiction which is flexible, expansive and dynamic. The earlier jurisdictional standards have been discarded for a more realistic evaluation of basic fairness; a foreign defendant is amenable to suit if it has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of 'fair play and substantial justice.' " International Shoe Co., supra 326 U.S. at 316, 66 S.Ct. at 158.[25]

Whether the judicial power of the forum may be invoked depends in each case on the peculiar circumstances and the cause of action involved, that is to say, on whether it is fundamentally

22. E. G. Etzler v. Dille and McGuire Mfg. Co., 249 F.Supp. 1 (W.D.Va.1965) ["Causing tortious injury by an act or omission in this State" under the Virginia "longarm" statute, § 8–81.2, Va. C.A.]; Hoffman Motors Corp. v. Alfra Romeo, supra ["Transacting business within the State" under the New York "long arm" statute, § 302 C.P.L.R.]

In Partin v. Michaels Art Bronze, 202 F.2d 541, 543 (3rd Cir. 1953). Judge Goodrich summarized the usual procedure in the following oft-quoted passage: "There are two parts to the question of whether a foreign corporation can be held subject to a suit within the state * * * If the state has purported to exercise jurisdiction over the foreign corporation, then the question may arise whether such attempt violates the due process clause * * * This is a federal question * * * But it is a question which is not reached for decision until it is found that the state statute is broad enough to assert jurisdiction over the defendant in a particular situation." 202 F.2d at 543.

23. Goldberg, supra; Lone Star, supra; Transo Envelope Co. v. Murray Envelope Co., 227 F.Supp. 240 (D.N.J.1963). "In the absence of congressional guidance, Federal Courts have traditionally held that the constitutional limits on the jurisdiction of State Courts are equivalent to the standard for Federal jurisdiction." Note, "Jurisdiction of Federal District Courts Over Foreign Corporations," 69 Harv.L.Rev. 1211 (1966).

24. See, e. g. Kurland, "The Supreme Court, The Due Process Clause and The In Personam Jurisdiction of State Courts—From Pennoyer to Denckla: A Review," 25 U.Chi.L.Rev. 569 (1958); Currie, "The Growth of the 'Long Arm'." 1963 U.Ill.L.F. 533; Von Mehren and Trautman, "Jurisdiction To Adjudicate" 79 Harv.L.Rev. 1121 (1966)).

25. Although interpretations of Chief Justice Stone's opinion vary, it is generally agreed that the decision signaled a qualitative change in the prescribed mode of analysis; the earlier cases had taken account of the defendant's ties to the forum state, but tended to do so in terms of a quantitative attempt to determine whether jurisdiction was thereby established for all purposes. *International Shoe* requires a case by case approach, *even in regard to the same defendant and the same forum.*

unfair to force the defendant to defend that particular claim in the forum State.[26]

While *International Shoe* involved regular solicitation of business by the defendant corporation's agents within the State,[27] *McGee* indicated that considerably less would suffice. It held an isolated contact with the forum State sufficient because of its causal relation to the claim in controversy.[28] The most recent elaboration of *International Shoe* came in *Hanson* where the Court reiterated that notwithstanding the relationship between the cause of action and defendants contacts with the forum, a minimal threshold level of contacts is required.[29] Reviewing *International Shoe* and *McGee*, the Court concluded, 357 U.S. at pg. 253, 78 S.Ct. at pg. 1240,

> "The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

In Rosenblatt v. American Cyanamid Co., 86 S.Ct. 1, at 3, 4, 15 L.Ed.2d 39 (1965) [30] Mr. Justice Goldberg, in chambers, cited with approval Professor Currie's generalization of the *Hanson* test as a requirement "that the defendant must have taken a voluntary action calculated to have an effect in the forum State." *Currie,* supra at 549. This interpretation of the phrase "conducting activities within the forum State" is confirmed if *Hanson* is read in light of *McGee* where the defendant's activity within the State consisted solely of business correspondence with and receipt of premiums from the insured resident.

At the present juncture, plaintiffs predicate Nationale's contact with this forum on the aforementioned license agreement and the business relationship which it created. Having considered all the pertinent aspects of that enterprise,

---

26. While few commentators have been deterred from offering typological schemes, the difficulty of formulating broad general rules has been well summarized as follows: "In conclusion, although some writers have made the attempt, it is not possible to be precise in defining the 'minimum contacts' which will sustain jurisdiction over due process objections. The reason for the difficulty is an obvious one—that due process, or its equivalent expressed in terms of 'minimal contacts' is simply a test of fundamental fairness; and without a specific factual context, it is impossible to say with certainty what fairness is." Note, "The Virginia 'Long Arm' Statute," 51 Va.L.Rev. 719, 728-729 (1965).

27. The defendant was a Delaware Corporation which had no property or office in the State of Washington, but which did employ local salesmen to solicit orders there. Washington sought unemployment insurance contributions and the company interposed objection to the State Court's jurisdiction.

28. An Arizona insurance company had issued a policy to the plaintiff's husband, a California resident. The insured later received a reinsurance certificate from the defendant, a Texas insurer which had taken over the Arizona insurer's accounts, offering to insure him in accordance with the old policy. He sent them the subsequent premiums accordingly, and upon his death and a denial of liability, his wife obtained a California judgment. The jurisdictional defense was raised when she tried to sue upon it in Texas.

29. The Court denied jurisdiction in *Hanson* in regard to a trust fund. The objecting defendant trustee had no contact with Florida in the course of his duties other than the fact that the settlor had died there and had exercised certain powers of attorney there before her death. She was not a Florida resident when the trust was established nor was it set up or administered there.

30. The proceeding was an application for a stay of judgment pending appeal on the grounds the trial court lacked personal jurisdiction. The question facing Mr. Justice Goldberg was whether plenary review by the United States Supreme Court was likely, in which case a stay would have been granted. He held the constitutional argument insubstantial on the basis of a factual pattern and a State "long arm" statute which are distinguishable from this case. However, his review of the trend of decisions in this area and the citation of *Currie* are relevant.

as well as the special circumstances of the instant controversy, I find that Nationale may be joined as a defendant in this action without violating the dictates of fundamental fairness required for due process.

■ Nationale asserts that its ties are nebulous and do not amount to doing business within the State. It is not necessary that they do. The concept of "doing business", like the earlier tests of presence and consent, has been expressly abandoned as a litmus test for measuring the reach of State judicial power over foreign corporations. *McGee*, supra, 355 U.S. at 222, 78 S.Ct. 199.[31] Thus, the decisions cited by Nationale which turned on whether the defendant was "doing business" within the State are inapposite.[32]

Within the meaning of *McGee* and *Hanson* Nationale has embarked upon an enterprise within the forum State which involves the benefits and protection of its laws. The agreement repeatedly illustrates this nexus.

Nationale entered into the agreement in order to realize the pecuniary benefits of royalties from Ronson's operations which are headquartered in New Jersey. To ensure those benefits would be fully forthcoming, Nationale retained significant power of supervision and verification of Ronson's records. It is to receive accurate accounts of the unit sales and total revenues, and it may verify them through an independent certified accountant.

In addition Ronson must communicate to Nationale any improvements, patentable or not, which it may discover during its activity as a licensee in regard to these patents and their use. Nationale is to respond by communicating any improvements it develops to Ronson. In general, Nationale is to provide all information and technical assistance to Ronson which is necessary to enable the valves to be manufactured and sold as components of gas lighters to best advantage.

Further, Ronson is to give notice to Nationale of threatened infringement and Nationale will let its name be used and give any assistance which may prove necessary in proceeding against such infringers including a share in the costs of litigation and in any damages recovered. Indeed, it appears this has already been the case on several instances.

In short, it is clear that Nationale not only has retained a substantial interest in the patents themselves. It also has a great interest in Ronson's successful use and protection of these patents in connection with, *inter alia,* its operations in this State. The ties by which these interests are promoted are not merely empathetic encouragement; they are concretely embodied in a continuous stream of business correspondence, remittance of royalties, consultation in regard to present and possible future litigation, financial and technical assistance and other contacts which the agreement encompasses.

The relationship is not one of such complete agency that would entitle plaintiffs to serve Nationale by leaving process at the New Jersey offices of Ronson. See Mays v. Mansaver Industries, 196 F. Supp. 467 (E.D.Pa.1961). But neither is

---

**31.** Of course the amount and nature of business activity in the forum with which the defendant has connections is a very important factor to be considered. But it is only *the critical* test when the State statute stops short of due process limits and a two-stage inquiry is required. See supra, n. 22.

**32.** Olympic Radio & Television, Inc. v. Hazeltine Research, Inc., 85 F.Supp. 579 (E.D.N.Y., 1949) did not discuss sufficient contacts under *International Shoe* at all; the "doing business" standard applied was that of the general venue statute, 28 U.S.C. § 1391(c) which the defendant denied was applicable to his activity in New York. Mississippi Chemical Corp. v. Vulcan-Cincinnati Corp., 224 F.Supp. 11, (S.D.Miss., 1963) dealt with the State statutory requirement that the defendant be doing business within the State. Again, the constitutional question was not reached since jurisdiction was denied on the grounds that its assertion would not be within "the purview of this statutory scheme." 224 F.Supp. at 13.

this a "one shot" purchase and sale agreement with no continuing contacts between the foreign corporation and the forum State. See Purdy Co. v. Argentina, DGFM, 333 F.2d 95 (7th Cir. 1964). The important point is that through a series of continuing ties Nationale has set in motion substantial operations in New Jersey and availed itself of the benefits therefrom.

Finally, in regard to all of these agreements and undertakings, the licensing contract provides that it is New Jersey law which is to govern the relations of the parties.

The second signifcant factor is the relationship between Nationale's "minimum contacts" and the particular cause of action in this lawsuit. Were this a case of Ronson attempting to sue Nationale in regard to their licensing agreement, it seems beyond question that personal jurisdiction could be found. The question, then, is whether a suit for a declaratory judgment in regard to patents, brought by plaintiffs who are not a party to the licensing agreement is also sufficiently related to those contacts to support jurisdiction. I think it is.

The matter cannot be neatly fit into any of the traditional categories of tort, contract or ownership of in-state property. To an extent, this suit bears analogy to each. It is the licensing agreement which gives Ronson the power to make damaging charges of infringement; at the same time, while the technical situs of the patents is the District of Columbia, the financial assets they represent are in a real sense represented in large measure by the licensed operations of a New Jersey corporation. In *McGee* the Court

did not find the place where the contract was consummated to be critical. "It is sufficient for purposes of due process that the suit was based on a contract which had a substantial connection with that State." 355 U.S. at 223, 78 S.Ct. at 201. Thus, however the plaintiffs' claims are characterized, they clearly arose from and are inextricably related to the patent license which ties Nationale to this forum.[33]

The fact that plaintiffs are not New Jersey residents does not require a different result, although I have taken it into consideration. Gkiafis v. Steamship Yiosonas, supra, 342 F.2d at 556; Blount v. Peerless Chemicals, Inc., 316 F.2d 695, 697 (2nd Cir. 1963) cert. denied 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). In some cases the Courts have emphasized the forum State's interest in protecting its residents, especially in regard to certain areas of commerce such as insurance. E. g. *McGee*, supra, 355 U.S. at 223–224, 78 S.Ct. 199, 2 L.Ed.2d 223; Travelers Health Ass'n v. Commonwealth of Virginia, 339 U.S. 643, 648–649, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). The absence of that consideration here is offset by the fact that there is no competing interest of another forum in which Nationale's defense of its patent would be appreciably easier. The defendant is a Swiss corporation, well represented by counsel in New Jersey. Moreover, since the suit arises from alleged charges made by its licensee, Nationale's defense would certainly be carried on in close conjunction with the defendant Ronson whose main offices and officers are located here. While the official Patent Office records are in the District of Columbia, Nationale must have the pertinent information in

---

33. Compare Venus Wheat Wafers, Inc. v. Venus Foods, Inc., 174 F.Supp. 633 (D. Mass., 1959) where the Court did deny jurisdiction because of insufficient contacts to satisfy due process. In *Venus* however, the affiliating circumstances, insofar as they bore on the cause of action, were less substantial than those engendered by Nationale's agreement with Ronson.

The defendant manufacturer sold food products outright to its Massachusetts distributor, but had occasionally provided financial aid in the form of promotional materials and allowances. The suit involved a trade mark grievance not intimately related to this distributorship which was the defendant's sole contact with the State. Hence, the Court was unwilling to hold "that every company follows its products into any state that a buyer purchasing for resale does business in if it offers the buyer any encouragement or financial assistance." 174 F.Supp. at 635.

its own files and/or in Ronson's files. The other issues of the suit turn on the actions of Ronson and of the plaintiffs whose representatives are located in New York.

In *McGee,* the Court indicated that once the threshold question of minimal contacts was satisfied, these practical considerations of convenience and trial logistics were relevant in determining the fundamental fairness of submitting the defendant to the jurisdiction of the forum. "At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." 355 U.S. at 223, 78 S.Ct. at 201. Accord J. W. Sparks Co. v. Gallos, N.J., 220 A.2d 673 (June 6, 1966).

In light of all the foregoing discussion, I am satisfied that Nationale has such minimum contacts with this State and with this forum,[34] and that such contacts are sufficiently related to this cause of action that the maintenance of this lawsuit "does not offend traditional notions of fair play and substantial justice."

Accordingly, since Nationale has been properly served, is subject to the Court's jurisdiction, and cannot object to the venue, its motion to quash the service and dismiss the complaint is denied.

## MOTION TO DISMISS FOR FAILURE TO JOIN AN INDISPENSABLE PARTY.

III. Ronson contends that Nationale is an indispensable party to this action, within the meaning of Rule 19, Fed.R.Civ.

P., by virtue of its retained interest in the "Zellwager Patents" and its rights under the licensing agreement

The question of when such a licensor-patentee must be joined with his licensee in a declaratory judgment action of this type is an extremely complex one which has been ably analyzed by both parties. However, this Court's determination that Nationale has been properly joined as a party defendant renders that issue moot and the Motion to dismiss under Rule 19 is, accordingly, denied.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

IV. Ronson's last two motions both deny the existence of justiciable controversy within the purview of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Rule 57 Fed.R.Civ.P.; the second is a motion for summary judgment under Rule 56, Fed.R.Civ.P.

Since the parties have introduced numerous affidavits and other documents, the motions will be consolidated and considered against the standards of Rule 56.[35]

## MOTION FOR SUMMARY JUDGMENT.

V. The requirements for summary judgment under Rule 56 are well established. The Rule may not be used to avoid trial on issues legitimately in dispute. The Court may consider the affidavits and other submitted material to determine whether a genuine issue of fact exists, and must defer to the affidavits if unopposed;[36] but such papers are

---

**34.** While the plaintiffs have utilized the New Jersey long arm statute, *quaere* whether in a Federal action such as this, the relevant "affiliating circumstances" may not include the ties which Nationale has with the United States Federal system as a whole, by virtue of its patents. Those ties, of course, do involve the interest of the Federal system in vindicating its substantive law policies in this area. Cf. Von Merhen and Trautman, supra, 79 Harv.L.Rev. 1124–1125.

**35.** Rule 12(b) (6) provides that when a motion to dismiss for failure to state a

claim is made and "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 * *." Siegel v. First Pennsylvania Banking and Trust Co., 201 F.Supp. 664 (E.D.Pa. 1961).

**36.** The 1963 amendment to Rule 56 precludes the earlier practice in this Circuit of denying summary judgment even where the movant's affidavits were opposed only by bare denials or affirmations in the complaint. But even now, once the mo-

not to be used to resolve the issue in the manner in which the evidence would be weighed at trial. Bragen v. Hudson County News Co., 278 F.2d 615 (3rd Cir. 1960). Rather, the movant must demonstrate the complete absence of any triable issues.

■ For Ronson this includes demonstrating that there is no genuine issue as to whether or not a controversy exists between the parties cognizable under the Federal Declaratory Judgment Act, (even though it is the plaintiffs who will ultimately have to establish such a controversy at trial as a prelude to declaratory relief).

Consideration of the pertinent case law in this Circuit, the purpose of the Declaratory Judgment Act, and the peculiar facts at Bar leads me to the conclusion that at this point Ronson has not met this heavy burden.

■ The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never. The Act permits parties so situated to forestall the accrual of potential damages by suing for a declaratory judgment, once the adverse positions have crystallized and the conflict of interests is real and immediate. Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). As the present motion vividly illustrates, the determination of when that point is reached (so that the plaintiff can no longer be said to be seeking a purely advisory opinion) is an elusive one. Whether or not such a dispute exists is a question of degree which turns on the facts of each case and for which no hard rules can be given. Ibid.

■ Nonetheless, the cases in this Circuit do offer some guidance in the case of a patent action for a declaration of non-infringement and invalidity. Such an action must be based on the plaintiff's well grounded fear that should he continue or commence the activity in question, he faces an infringement suit or the damaging threat of one to himself and his customers. The touchstone is a *reasonable apprehension*. There must be, in other words, some concrete indication that the defendant patentee claims the plaintiff's activity infringes his patent, and also that he will act affirmatively to enforce the protection which he claims.[37]

■ On the one hand, neither academic interest nor cautious speculation will suffice. "The mere existence of the [defendant's] patent is not a cloud on title enabling any apprehensive manufacturer to remove it by suit. *Treemond*, supra, 122 F.2d at 706. The plaintiff's fearful conjecture that at some future time the defendant may initiate infringement proceedings will not support the suit. *Hartford*, supra 219 F.2d at 570–571.

On the other hand, the patentee may manifest his threatening posture in any of several ways. The clearest, of course, is an unequivocal charge of infringement made directly to the would-be plaintiff. Alternatively, he may send a thinly veiled threat to the plaintiff or tell his customers that they face suit for purchasing plaintiff's infringing product. Often, however—and this is the source of the present problem—the claims of infringement are made more generally or more indirectly, or both. Thus, an advertising circular may be sent through the trade warning that a certain product made or sold by anyone in the industry will infringe the advertiser's product. *Dewey &*

tion is opposed by specific allegations of fact in the opponent's affidavit and exhibits, the motion must still be denied if a dispute appears. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1963).

37. Hartford National B. & T. Co. v. Henry L. Crowly Co., 219 F.2d 568 (3rd Cir.

1955); Federal Tel. & Radio Corp. v. Associated Tel. & Tel. Co., 169 F.2d 1012 (3rd Cir. 1948); Aralac Inc. v. Hat-Corp. of America, 166 F.2d 286 (3rd Cir. 1948); Dewey & Almy Chemical Co. v. American Anode, Inc., 137 F.2d 68 (3rd Cir. 1943); Treemond Co. v. Scheering Corp., 122 F.2d 702 (3rd Cir. 1941).

*Almy Chemical Co.,* supra, 137 F.2d at 71 (dictum) ; *Federal Tel. & Radio Corp.,* supra.

In the leading case of *Dewey & Almy* (hereinafter *Dewey*) the Court of Appeals held that where the defendant has publicly made claims for his patent which encompass plaintiff's similar product (or process) and which were made against a sufficiently threatening background, the plaintiff may treat such claims as a general charge of infringement against the kind of product embraced by those claims and sue for declaratory judgment. 137 F. 2d at 70. While the defendant must have asserted some claim under his patent, he need not have directly charged the plaintiff with infringement.[38] Indeed, he need not even have known about plaintiff's activity before the action was commenced. Id. at 71.

Since plaintiffs here find the *Dewey* case dispositive of this motion, and Ronson urges with equal vigor that it does not apply, that decision merits close examination.

American Anode (Anode) held patents on certain "coagulant dip" rubber processes used to make rubber from crude latex. Anode sued a third company, Lee-Tex, for infringement after it had failed in attempts to line up the whole industry as licensees. In the course of the litigation Anode publicly claimed that the unauthorized use of any coagulant dip process similar to its patented ones would infringe. In addition, during a recess in the Lee-Tex trial, an Anode executive made a veiled threat of further litigation against the industry to a group which included a representative of Dewey & Almy that had congregated in the hall.

Reversing the lower Court's grant of summary judgment for Anode, the Court found a sufficient controversy to support the action:

"The patentee has used its patents as an economic weapon against other alleged infringers * * *. In its suit against Lee-Tex Company Anode has alleged that the coagulant dip process * * * constitutes an infringement. *It is not denied* that Anode has thus publicly asserted *such a scope for its patent claims as to embrace—the similar methods practiced commercially by Dewey & Almy.* We think this assertion evidences a substantial controversy between Anode and Dewey & Almy (parties manifestly having adverse legal interests), 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' [Citations omitted]." 137 F.2d at 70. [Emphasis added.]

In the present case, it is not alleged that Ronson has ever directly charged that the filler valve design disclosed by plaintiffs' "Kanamaru Patent" infringes the "Zellweger Patents" which Nationale licensed to Ronson. In fact, Ronson disclaims any knowledge of that design prior to the commencement of this suit, and further disclaims having sufficient knowledge of it even now to decide whether it infringes or not.

*Dewey,* however, makes both direct charges against and knowledge of the plaintiff's particular product unnecessary. Therefore, plaintiffs rely on the fact that Ronson and Nationale have threatened to sue and have sued others for the infringement of the two "Zellweger Patents".

Ronson contends that the holding in *Dewey* is inapplicable on two counts: First, it denies having made any claims for its patents during the course of the aforesaid charges against other lighter valves which could be construed as embracing the construction used by plaintiffs. Second, it denies taking any action toward the industry which could reasonably be regarded as threatening toward plaintiffs or their customers. Hence, it maintains that no significant dispute

38. In dictum, the *Dewey* opinion even contemplated actions lying if the patentee had made no express charge of infringement to anybody, but had stated claims for it sufficiently broad to encompass the competitor's product by implication. 137 F.2d at 70. This is the position advocated in MOORE in the comment on *Dewey.* 6 Moore, Federal Practice, (2 Ed. 1960), 3120–3121.

exists about its past or present behavior and that it need only be determined that such behavior, as a matter of law, does not constitute a justiciable controversy.

The difficulty with this approach is that contrary inferences all too often may be drawn from the same overt behavior; frequently, this is a crucial step in the jury's or Court's determination of the issues. Thus plaintiffs maintain that a controversy has arisen because they conclude from the same behavior that Ronson 1) has claimed a proprietary scope for its patents broad enough to cover their valve design, and 2) has demonstrated by its litigious posture toward the industry, an intent to actively exert the power of its patents beyond their lawful limits.

*Scope of Ronson's Past Charges*—In regard to the scope of its past claims of infringement, Ronson's basic point is this: It urges that in *Dewey*, the declaratory judgment action was permitted only because the plaintiff—indeed, the entire industry—was admittedly using the same process as the one used by Lee-Tex which Anode had sued for infringement. In contrast to this, Ronson stresses that the Plaintiff Association itself asserts that the "J–2A" valve incorporated in their lighters is substantially different from previous value structures, including Ronson's own valves and those Ronson has sued.[39] Moreover, plaintiffs' own patent raises a presumption of sig-

nificant innovation. Ronson submits that,

> "[P]laintiffs cannot rely on cases which are based on the proposition that the whole industry *was doing the same thing*, and, at the same time, assert that the valve plaintiffs allegedly intend to make is so unique that it is patented." Brief for Ronson, pg. 8. [Emphasis added.]

The italicized words reveal the heart of the matter. Unlike Ronson, I do not read *Dewey* and its progeny as requiring virtual identity between the would-be plaintiffs' item and those produced by the defendant or by others whom the defendant has threatened. While the earlier cases advert to the similarity between the products in competition (and in some cases there apparently was virtual identity), they do not reveal what variation may have existed among the versions sold by each company.

The *essential* rationale of *Dewey* was the reasonable implication of Anode's claim about the scope of its patent and what would infringe it. Since Anode thought its patent overlapped the process being used by Dewey & Almy and there was reason to believe it would try to confirm this view in Court, the plaintiff faced the very threat of litigation at Anode's pleasure which the Declaratory Judgment Act was designed to meet.

In short, the controlling factor in *Dewey* was the defendant patentee's ex-

39. Both the "Zellweger Patents" and the "Kanamaru Patent" (now held by the Plaintiff Association) concern the small filler valve through which liquid butane may be injected into the lighter's fuel reservoir from a "refill" container. The butane remains under pressure in the reservoir until the user releases it by engaging the ignition mechanism. The fuel then becomes gaseous and is ignited. Both valves also permit the venting of useless gaseous vapors from the reservoir while the fresh supply of liquid butane is being added.

Although an oversimplification, it suffices for present purposes to note that the "Zellweger Patents" teach the use of a refueling bomb with two separate conduit chambers: a "hollow needle" charging conduit through which fuel is in-

jected, and another venting conduit through which the vapors leave the lighter.

The "Kanamaru Patent", on the other hand, claims to have eliminated the need for two separate conduits and allegedly permits charging and venting simultaneously by means of counter-current streams flowing within the same single valve chamber. Moreover, this change formed a main basis of the "Kanamaru Patent" application.

The plaintiffs maintain that this filler valve construction is of vital importance in the gas lighter industry because the consumer desires the easiest and most efficient way to refill his lighter and vent useless fumes. [Tr. 52.]

pressed view of the relation between his patent and the process used by the plaintiff; it was not necessarily the plaintiff's own view or even the view which a Court would have reached after full litigation on the issue of infringement.

Even had Dewey & Almy firmly felt that its process was distinguishable and did not infringe, it hardly could have faced the accrual of potential damages with equanimity and with confidence in the eventual outcome of a lawsuit; the history of judicial interpretation of patent claims, after all, presents a case law developing with something less than undeviating clarity.

This is precisely the dilemma which plaintiffs face although they feel their own design does not infringe Ronson's.[40] Hence, if the two valves are at least sufficiently similar to give plaintiffs reasonable grounds for their fear, it is Ronson's position which controls. That is to say, if Ronson has in fact intimated publicly that lighter designs of the type used by plaintiffs infringe its own, that is the critical assertion.[41]

To be sure, plaintiffs cannot play both sides of the street. If the differences indicated by the Kanamaru Patent are so substantial that plaintiffs' fears are clearly conjectural, that would negate a real controversy and place them beyond the pale of *Dewey;* but I cannot conclusively make such a finding at this point. On the other hand, it seems obvious that two versions of a product may be both the same and different depending on the level of generality at which they are compared.[42]

The appropriate level for comparing the valves made by Ronson and by plaintiffs is the level of generality at which Ronson made claims for the scope of its patents. In other words, the broader Ronson's past claims for the preserve of the "Zellweger Patents" the more the plaintiffs' "J–2A" valve *might differ and*

40. At the hearing, plaintiffs' counsel put the matter thus: "There is no doubt that they have what they regard as a good different structure, but they have seen enough of patent litigation to feel you cannot predicate substantial business investments upon a guess as to what Courts will do. Tr., 45; And see Fukashiro Aff., Para. 13.

41. In Federal Tel. & R. Corp. v. Associated Tel. & T., supra, the complaint filed by Federal alleged that the patents which Associated charged had been infringed "contain 'one or more claims finding literal response' in Federal's apparatus though none of these claims, if properly construed, would sustain an infringement suit." 169 F.2d at 1013. The factual situation was quite different from the instant one; the point is simply that the Court found the defendant's claims gave rise to a controversy, *even though* the plaintiff maintained its product was different and not infringing.

Similarly, Hartford National B. & T. Co. v. Henry L. Crowley Co., supra, though cited by Ronson, illustrates that the controlling factor is the defendant-patentee's position as to whether plaintiff's product may come within his patent.

That case involved a labyrinth of claims and counter-claims, but it suffices to note the following: One Phillips had charged Crowley with infringing Phillips' patent. Crowley sued for a declaration of non-infringement in New York. Phillips had claimed the two products were essentially alike and that Crowley's was within the scope of Phillips' patent. In defense, Crowley maintained that what he was doing was within the scope of his own (Crowley's) patent, whereupon Phillips brought a second declaratory judgment suit in New Jersey for a decree that his product did not infringe Crowley's patent. Phillips reasoned that the implied conclusion of his claims and Crowley's defense was that Crowley had charged Phillips' product with infringing Crowley's patent. The Third Circuit denied the second action because Phillips' fear was purely conjectural; only Phillips (the plaintiff in the second suit) and not Crowley (the defendant) had ever claimed a sufficient similarity between the two. Crowley had specifically written Phillips that the latter's product did not infringe Crowley's patent. Again it was the defendant's position which was deemed critical. 219 F.2d at 570.

42. For example, *quaere* under what circumstances an improved filter cigarette with a modified filtering substance would be considered the "same product" as an earlier version, and when it would be considered a different product.

*yet come within the ambit of those claims.*[43]

In *Dewey* the Court found the plaintiffs' apprehension warranted by the close similarity between Dewey & Almy's "coagulant dip" process and the Lee-Tex process, by the claims Anode had made at the Lee-Tex trial, and by Anode's overall threatening posture toward the industry. But *Dewey* and the other early cases serve us here as guiding precedent, not *res adjudicata;* whether or not Ronson's charges against others warrant apprehension depends on the particular nature of those claims and on the peculiar technical aspects of the valves, not upon the specific facts in *Dewey.*

Plaintiffs rely primarily on statements made in open Court during Ronson's infringement action against Maruman of California, Inc., and other distributors. Ronson et al. v. Maruman et al., 224 F. Supp. 479 (S.D.Cal.1963). For example, at one point counsel for Ronson stated that the original "Zellweger Patent" was a "pioneer" and as such entitled to a very broad scope of protection. He then seems to have suggested at a later point that the patent, so construed, would cover any valve employing a moving member using either reciprocal or rotary motion for the purpose of simultaneously filling and venting the lighter.[44]

Plaintiffs contend that these public assertions of what would infringe the "Zellweger Patents," as well as other remarks Ronson had made, were so sweeping and general that they covered even the new design of the "J–2A" valve disclosed by the "Kanamaru Patent."

The sole question before me is whether a controversy exists. Neither the validity of any patents nor the question of their infringement will be determined without a full trial on those issues. But if the plaintiff's interpretations of the aforesaid statements is correct a controversy may exist.

 Not surprisingly Ronson vigorously disputes this interpretation.[45] It should be clear that the Court's present conclusions do not turn on a finding as to the true import of those remarks. The excerpts in plaintiffs' exhibits are taken out of context and may not, upon close scrutiny, reveal the import which plaintiffs attribute to them. But it cannot be gainsaid that the term of art, "pioneer patent", is ordinarily used to connote very broad protection in regard to a wide range of functional equivalents for the patented design. 3 Walker on Patents (Deller Ed.) 1709, 1714, 1718, 1720 (and cases cited therein). This claim in conjunction with the other statements, is at least open to several interpretations depending on what further discovery re-

---

**43.** On this point, the decision in *Aralac,* supra on which Ronson relies is easily distinguishable. Aralac produced casein fibers which it sold to hat manufacturers. They in turn combined them with natural fur fibers to make a composite "fur felt." The defendant did not manufacture casein fibers at all, but held a patent on the process of combining the two kinds of fibers into the composite felt. He had charged Stetson, one of Aralac's customers, with infringing this patented process. In that setting, the Court of Appeals affirmed the dismissal by the trial Court since the threats made to Aralac's customers were not directed at the product in which he dealt. "The charge of infringement under defendant's patent have been against a product and a process with which plaintiff has no connection. * * * Plaintiff could demand the protection of its right to sell the casein fiber. It has no right to demand that others be allowed to practice the patented process in violation of patent monopoly in order that it might have a market for its fibers." 166 F.2d at 293. *Per contra,* plaintiffs at bar produce the very same item which Ronson's patents involve, filler valves for gas lighters.

**44.** Plaintiffs' Exhibits 5, 6, and 8.

**45.** "It is *clear and certain* from the context * * * that the participants at [the *Maruman*] trial understood the implied limitation on counsel's statements. No one could be misled into believing that *any one* of these statements means that Ronson or La Nationale was contending that any valve whatsoever is an infringement, provided only that it operates either by reciprocating or by rotary motion." [Emphasis added.] Ronson's reply Brief, pg. 16.

veals concerning those proceedings and other representations Ronson may have made at different times. In summary, I find the exact nature and scope of these claims raises a genuine dispute which it would be premature to resolve on the basis of the information before me.

*Were the Claims Made in a Threatening Context*—Assuming without deciding, that Ronson's past charges of infringement involved claims embracing plaintiffs' valve design, those charges must also be weighed in the light of Ronson's general posture toward the industry. Plaintiffs assume that if their valve comes within the area which Ronson has staked out for its patent, Ronson will sue them or menace their customers directly; to come within the rationale of *Dewey* set forth above, this conclusion that their economic interests are actually threatened must be well founded.

They claim Ronson has made "widespread allegations of infringement" [and] has threatened virtually every manufacturer of gas lighters [and filed] a multiplicity of suits." Complaint, para. 12.

In reply, Ronson offers a numerical breakdown of the lighter valves it has evaluated into: 1) those it does not consider to infringe the "Zellweger Patent"; 2) those which it feels may infringe them; and 3) those few for which it has actually sent warning notices or filed

suit for infringement. Trimeas Aff., para. 13; Ronson's Reply Brief, pg. 3.

These need not be detailed here. On the one hand, such facts may prove plaintiffs' characterization of Ronson as trigger-happy to be erroneous. On the other hand, the plaintiffs do not have to establish every single allegation in their complaint to prevail, provided they at least establish that Ronson has been sufficiently litigious.

Ronson does admit sending some letters and filing some suits. It *has* used its patent, in other words, as an economic weapon against alleged infringers. *Dewey*, supra 137 F.2d at 70. It may be true that in so doing Ronson and Nationale "have done no more than they were entitled to do under their patent rights", Ronson Brief, pg. 16, but this does not negate the *in terrorem* effect of such action on others. Ibid.[46]

Nor is the fact that other manufacturers who might fall within the scope of Ronson's charges have not yet been sued conclusive as to whether plaintiffs should feel threatened. Defense counsel himself admitted that the decision to institute infringement proceedings at any given time depends on many strategic factors. That decision is not conclusive as to the patentee's opinion of his ability to sue for infringement when he chooses to do so.[47]

Ronson now declares it has no present intention of suing plaintiffs or threaten-

46. Ronson stresses the fact that in *Dewey*, an implied threat was made directly to a group of industry representatives, which included a Dewey & Almy officer, during the recess in the Lee-Tex trial. However, the Court indicated that this incident only strengthened the inferences, already present from the Lee-Tex litigations itself, that Anode was counting on the *in terrorem* effect of the lawsuit. 137 F.2d at 70.

In Central Hide and Rendering Co. v. B–M–K Corp., 19 F.R.D. 290 (D.C.Del. 1956) the Court found no controversy existed between Central Hide and the defendant, since the latter had neither threatened Central Hide nor taken sufficiently public action against others. However, the Court distinguished *Dewey* on the grounds that no suits at all had been

brought by B–M–K, (only private letters had been sent). 19 F.R.D. at 293. The case does not stand for the proposition that public lawsuits are private matters between the parties thereto. C.f. Brief for Ronson, pg. 19.

Moreover, plaintiffs herein have specifically alleged difficulty in marketing their lighters in America as a result of Ronson's past litigation and threats. Kanamaru Aff.

47. Tr. pg. 61; In E. W. Bliss Co. v. Cold Metal Process Co., 102 F.2d 105, (6th Cir. 1939), an actual controversy was held to exist even though it was evident that the patentee was exerting every effort to avoid entanglement in litigation with the particular alleged infringer seeking the declaration.

ing their customers in regard to the "J–2A" valve. Nevertheless, I find a determination on this point also raises questions of inference, and credibility as to what the situation was when this suit was instituted. In view of the aforementioned contrary allegations and inferences, Ronson's denials do not eliminate the need for further discovery and possibly trial; they require it.

In addition to the above, a further consideration has influenced the disposition of this motion. Ronson now seeks summary judgment at a very early stage of the proceedings, before it has answered the complaint or participated in discovery. Accordingly, the Court must exercise its discretion to shape the course of litigation with special care.

 The Declaratory Judgment Act, as a remedial provision, is to be given a broad, liberal construction. *Treemond,* supra 122 F.2d at 703; its limitation to "a case of actual controversy", 28 U.S.C. § 2201, merely reflects the general constitutional constraint of Federal jurisdiction imposed by Article III and is not a further technical narrowing of that power. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

Therefore, I am particularly wary of denying plaintiffs' day in Court on the complex issue of justiciable controversy when further pre-trial effort can illuminate the underlying facts. Sound judicial administration suggests the alternative of denying the motion for summary judgment at this point, without prejudice to Ronson's right to renew it before trial, or to move for a directed verdict under Rule 41(b), F.R.C.P., at the close of the plaintiffs' case.[48]

In the case of a second motion for summary judgment, the Court may find that a fuller record indicates, as a matter of law, the absence of a controversy within

the Act. In case of a motion under Rule 41(b), it may rule that the plaintiffs have failed to establish such a controversy on all the facts. Or, in either case, the Court may exercise its discretion to deny a declaratory judgment, even though it finds the statutory requirements are met. Eccles v. Peoples Bank, 333 U.S. 426, 68 S. Ct. 641, 92 L.Ed. 784 (1948). Any of these decisions now would be premature.

In light of the foregoing, the defendants' motion for summary judgment must be and hereby is denied.

Let an appropriate order be submitted.

---

48. Rule 41(b) is the equivalent, for cases tried without a jury, of Rule 50(b). "Where the movant's rights to a judicial determination on the absence of any disputed issues and on questions of law can be protected under the machinery of Rule 50(b) for a directed verdict, the Court should grant summary judgment only in the clearest of cases." 6 Moore, Federal Practice 2045.