519 F.Supp. 356 (1981)
ENKA B. V. OF ARNHEM, HOLLAND, Plaintiff,
v.
E. I. DU PONT DE NEMOURS & CO., Defendant.
AKZO PLASTICS B. V. OF ARNHEM, HOLLAND, Plaintiff,
v.
E. I. DU PONT DE NEMOURS & CO., Defendant.
Civ. A. Nos. 80-358, 80-359.
United States District Court, D. Delaware.
July 10, 1981.
*357 *358 *359 Roderick R. McKelvie, Robinson, McKelvie & Geddes, Wilmington, Del., for plaintiff; Ellsworth H. Mosher, Charles A. Wendel, Roger W. Parkhurst and Thomas W. Cole, Stevens, Davis, Miller & Mosher, Arlington, Va., of counsel.
James M. Tunnell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Joseph M. Fitzpatrick, Fitzpatrick, Cella, Harper & Scinto, New York City, Robert C. Kline, Wilmington, Del., of counsel.

OPINION
MURRAY M. SCHWARTZ, District Judge.
This opinion treats two closely allied actions under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for determination of the validity and enforceability of United States patents. No answers have been filed, defendant having instead moved to dismiss on jurisdictional grounds. Plaintiffs are Dutch producers of industrial fibers potentially within the scope of claims of American patents owned by E. I. duPont de Nemours & Co. Although they manufacture and do most of their marketing in Europe, each company alleges some stake in the American market that it regards as threatened by duPont's U.S. patents. Consequently, plaintiffs wish to challenge those patents. The issue before this Court is whether the stakes alleged and the threats perceived create a case or controversy that may vest jurisdiction in a federal district court. Finding that the requisite concrete interest has not been shown, the Court will dismiss the complaints for lack of subject matter jurisdiction.

I. PROCEDURAL POSTURE
DuPont has grounded its motions on both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The latter rule appears inapposite. A Rule 12(b)(6) motion goes to the merits of the substantive claims and may be converted into summary judgment under Federal Rule of Civil Procedure 56. A Rule 12(b)(1) motion, on the other hand, attacks subject matter jurisdiction and may require examination of factual issues wholly distinct from the case on the merits. Johnsrud v. Carter, 620 F.2d 29, 32-33 (3d Cir. 1980); Mortensen v. First Federal Savings & Loan Assoc., 549 F.2d 884, 891 (3d Cir. 1977). The motions presently before this Court fit the Rule 12(b)(1) category. DuPont's arguments concern not the patent validity issues, but the question whether plaintiffs' ties to the United States are sufficient to create an immediate apprehension of harm so as to warrant exercise of jurisdiction under the Declaratory Judgment Act. Therefore, today's decisions will be based on Rule 12(b)(1).
Treatment of these motions under Rule 12(b)(1) raises evidentiary issues that should be resolved preliminarily. A motion to dismiss generally requires that the wellpleaded factual allegations of the complaint be regarded as true. Third Circuit precedent establishes, however, that when the motion creates a factual issue regarding subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Mortensen, supra, 549 F.2d at 891 (dictum) [footnote omitted]. See also Nelson v. Keefer, 451 F.2d 289, 296 (3d Cir. 1971); Groh v. Brooks, 421 F.2d 589, 594-95 (3d Cir. 1970). It is believed that this rule should govern the *360 present motions.[1] Even though answers have not been filed, the record contains sufficiently full documentation for the court to find jurisdictional facts without recourse to presumptions. Equally important, plaintiff has had and used the opportunity to make discovery, present affidavits, and brief and argue the issues. With such a record, there can be no unfairness in dismissal of a case on jurisdictional grounds where, as here, the disposition in no way touches the merits of plaintiffs' underlying claims.[2]
A corollary of the procedure outlined above is the conclusion that the Court may view the evidentiary record as a whole, rather than restrict itself to scrutiny of the complaint. See Mortensen, supra, 549 F.2d at 891; Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir. 1979); Phoenix Canada Oil Co. v. Texaco, Inc., 78 F.R.D. 445, 452 (D.Del.1978). One limitation attaches to this principle: because jurisdiction must be determined as of the date the complaints were filed, July 30, 1980, the Court will not consider evidence of subsequent events alleged to create the concrete adversity needed for federal jurisdiction.[3]See Super Products Corp. v. D P Way Corp., 546 F.2d 748, 752 (7th Cir. 1976); American Needle & Novelty Co. v. Schuessler Knitting Mills, Inc., 379 F.2d 376, 379 (7th Cir. 1967); Technical Tape Corp. v. Minnesota Mining & Manufacturing Co., 200 F.2d 876, 878 (2d Cir. 1952).

II. LEGAL PRINCIPLES
Under the Declaratory Judgment Act, this Court may declare the "rights and other legal relations" of parties to a "case of actual controversy within its jurisdiction." 28 U.S.C. § 2201.[4] To determine the presence of an "actual controversy," the Court must assess the parties' relations in light of the familiar principles outlined hereafter.
The Declaratory Judgment Act has a broad, remedial purpose and should be interpreted liberally. See, e. g., Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); Treemond Co. v. Schering Corp., 122 F.2d 702, 703 (3d Cir. 1941). In patent litigation, a declaratory *361 judgment of invalidity or non-infringement serves two highly practical interests. It prevents a patentee from abusing the presumption of validity by threatening would-be competitors with his patent, yet refusing to face adjudication of its merit in an infringement action. See, e. g., Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87, 89 (2d Cir. 1963); Treemond, supra, 122 F.2d at 704; E. Borchard, Declaratory Judgments, 803-05 (2d ed. 1941). The availability of a declaratory judgment also permits would-be competitors to ascertain whether a market is open to them without fully committing their resources to arguably infringing activities and amassing avoidable liability in damages. See, e. g., Wembley, supra, 315 F.2d at 90; Girdler Corp. v. E. I. duPont de Nemours & Co., 56 F.Supp. 871, 875 (D.Del.1944).
These admirable policies do not, however, constitute the courts as roving inquirers into patent validity. The Declaratory Judgment Act established a new procedure and a new remedy only for conflicts within the bounds of Article III of the United States Constitution. The rights claimed by a declaratory judgment plaintiff must be in existence and at risk before there is a case or controversy for judicial resolution. See Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); Aetna Life, supra, 300 U.S. at 239-41, 57 S.Ct. at 463-64.
The courts have developed a form of jurisdictional inquiry appropriate to declaratory judgment patent cases. First it must be determined that the case properly arises under federal laws so as to permit invocation of federal jurisdiction. This requirement is met if the adverse action that plaintiff seeks to prevent would arise under federal laws. See Thiokol Chemical Corp. v. Burlington Industries, 448 F.2d 1328 (3d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). Second, live adversity between the two parties must be established by evidence that the defendant has acted so as to cause plaintiff "reasonable apprehension" of legal action if it continues to pursue its commercial course. See, e. g., Dewey & Almy Chemical Co. v. American Anode, Inc., 137 F.2d 68 (3d Cir.), cert. denied, 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943); Polaroid Corp. v. Berkey Photo, Inc., 425 F.Supp. 605 (D.Del.1976); Japan Gas Lighter Assoc. v. Ronson Corp., 257 F.Supp. 219 (D.N.J.1966). Third, plaintiff must show that its claim is concrete rather than academic by credible allegations of immediate intent and ability to undertake the business that must bring it into collision with defendant's patent claims. See, e. g., Super Products Corp. v. D P Way Corp., 546 F.2d 748 (7th Cir. 1976); Aralac, Inc. v. Hat Corp. of America, 166 F.2d 286 (3d Cir. 1948); Atlas Imperial Diesel Engine Co. v. Lanova Corp., 79 F.Supp. 1002 (D.Del.1948). In short, Congress' liberal grant of jurisdiction to anticipate legal injury is confined within constitutional limits by judicial inquiry into imminent events that must grow out of existing situations. Examination of the instant motions will proceed according to these general guidelines.

III. AKZO PLASTICS
Akzo Plastics B.V. ("Akzo") is a Dutch subsidiary of Akzo N.V., a holding company that encompasses a multi-national network of manufacturing companies. Akzo produces an industrial fiber, marketed under the tradename Arnitel, that is comparable to duPont's patented Hytrel. Both are polyetherester elastomers used in manufacturing a variety of molded products such as soccer balls, cable and the soles of sports shoes. DuPont has refused to enter into licensing arrangements with Akzo, instead commencing a world-wide patent battle joined by Akzo in other countries and now in this Court.[5]

A. Does the Case Arise Under the Patent Laws.

The first question is whether the case arises under the patent laws cognizable *362 in federal district court under 28 U.S.C. § 1338.[6] The complaint requests a declaratory judgment of patent invalidity and unenforceability, in effect, presenting the defenses that Akzo would raise if it were a defendant charged with infringement of those same patents. It is well-established that jurisdiction must rest not on defenses, but on affirmative claims of federal rights. Louisville & N. R. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Therefore, the Court must consider not Akzo's claims of patent invalidity, but duPont's federal rights whose force Akzo seeks to vitiate by declaratory judgment. If those rights arise from "any Act of Congress relating to patents," then this Court has jurisdiction under section 1338. See Thiokol Chemical Corp. v. Burlington Industries, 448 F.2d 1328 (3d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972); Milton Roy Co. v. Bausch & Lomb, Inc., 418 F.Supp. 975 (D.Del.1976).
Akzo challenges 14 duPont patents covering the substance Hytrel, processes for manufacturing it, and chemical "intermediates" used in production. Because its own product, Arnitel, and its means of production are arguably within certain of duPont's patent claims, Akzo fears liability for patent infringement. DuPont might, plaintiff asserts, bring actions against Akzo either for direct infringement of the product patents on the basis of sales of Arnitel in this country or for knowingly contributing to infringement by supplying customers who will here use or sell products made from Arnitel. Without purporting to comment on the merits of such hypothetical suits by duPont, the Court finds it clear that the cases would arise under 35 U.S.C. § 271, which defines and prohibits patent infringement. Thus the requirements of 28 U.S.C. § 1338 are met with regard to the product patents in suit.
The next question is whether claims regarding duPont's process and intermediate patents meet the test. Akzo currently produces Arnitel in Holland, and has no intention of manufacturing in the United States.[7] Consequently, there is no reason to believe that the activities that arguably infringe duPont's process and intermediate patents will occur in the United States. In that case, there would be no basis for an action by duPont against Akzo under 35 U.S.C. § 271. The Supreme Court has made clear that U.S. patents afford a territorially limited protection. "[I]t is not an infringement to make or use a patented product outside of the United States." Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 527, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972). See also In re Amtorg Trading Corp., 75 F.2d 826 (C.C.P.A.), cert. denied, 296 U.S. 576, 56 S.Ct. 102, 80 L.Ed. 407 (1935); John Mohr & Sons v. Vacudyne Corp., 354 F.Supp. 1113 (N.D.Ill.1973); Dr. Beck & Co. v. General Electric Co., 210 F.Supp. 86, 92 (S.D.N.Y. 1962), aff'd, 317 F.2d 538 (2d Cir. 1963). Thus, Akzo's commercial plans and current activities do not implicate duPont's federal rights in the intermediate and process patents at issue.[8] *363 In the absence of a plausible federal claim to which the defenses of patent invalidity and unenforceability might be raised, this Court lacks subject matter jurisdiction over such patents.

B. Is there a Case or Controversy?

Because the possibility of infringement suits regarding the U.S. product patents satisfies the requirements of 28 U.S.C. § 1338, the Court will proceed to determine whether the facts establish the additional case or controversy requirements necessary to a final conclusion that it possesses subject matter jurisdiction over those patents. Akzo must show that it has begun or will undertake commercial activity now jeopardized by a reasonable apprehension of infringement litigation based on duPont's U.S. patents. It will be seen that Akzo has satisfied one element of the test, threat of infringement action by duPont. The evidence does not, however, establish the imminence of arguably infringing activity in the United States. Consequently, the second element of the test is not satisfied and jurisdiction does not exist.

1. The Customer Liability Theory

Plaintiff has offered a number of theories of imminent or current harm attributable to duPont's aggressive assertion of its patent rights. First, Akzo fears that its customers will be subject to suit should they export Arnitel or products made with it to the United States. Second, Akzo foresees direct action against itself should it decide to manufacture or sell Arnitel in the U.S. Third, counsel offered at oral argument the theory that Akzo itself might be sued for inducing direct infringement by customers who ship infringing articles to this country.
Akzo relies primarily on the customer liability theory. Stated in terms of injury to plaintiff, the theory is that customers are being, or will be, deterred from dealing with Akzo by the prospect of liability for business done in the U.S. What follows reflects this Court's record knowledge of current relations between duPont and Akzo regarding use of United States patents in the competition for customers.
Akzo maintains a plant in Arnhem, Holland, that has produced commercial quantities of Arnitel for at least two years.[9] The record does not show precisely how much Arnitel is sold to European customers, who such customers may be, or the extent, if any, of customers' business in the United States. Correspondence between Akzo and various European manufacturers does indicate, however, that the American market carries some weight with potential Arnitel purchasers. Akzo has submitted documents recording manufacturers' requests for agreements that Akzo would indemnify the purchaser for expenses and liability incurred in the event of patent infringement litigation. Two of their requests specify indemnification for U.S. patent problems.[10] A third request came from a Hytrel-user interested in Arnitel, but with the proviso that "before we enter into any purchasing agreement we would insist that Akzo indemnify us against any legal action from Du Pont if we use Arnitel for fabrication of hose that is being sold throughout the world."[11]
Akzo's approach to the indemnity problem has changed over the years. The first documented request for indemnity met with outright rejection on the ground that "Akzo Plastic b. v. are not offering Arnitel in the USA and they are not willing to be exposed to infringement litigation in that country."[12] Fifteen months later, Akzo wrote to a different customer offering what appears to be a limited indemnity for actions *364 based on two of the U.S. product patents and some foreign counterparts.[13] Thus it is arguable that Akzo has come to the point of willingness to share its customers' American liability. As yet no indemnification agreement has been achieved.[14]
The prospect of liability through expanded legal action by duPont appears in memoranda and letters outlining the breakdown of attempts by Akzo and duPont to resolve their competitive positions by means short of world-wide litigation. In June, 1979, representatives of duPont and Akzo met in London to canvass the possibility of limiting the number of legal battles that need be fought. At this meeting, Akzo's René Sieders stated the position that plaintiff has taken in this Court: Akzo's real concern is to ensure that its European customers will feel secured against the threat of litigation should they export to the United States products incorporating Arnitel.[15] The minutes of this meeting are optimistic about the prospect of satisfactory agreement.[16] Less than a year later, the possibility of relatively amicable resolution of the patent battle was gone.[17] In a meeting of May 5, 1980, Akzo's representative learned, inter alia, "that if Akzo and/or its customers should export ARNITEL or any products made from ARNITEL to the United States, duPont would sue Akzo and/or its customers and/or agent(s) for patent infringement."[18]
The factual case for a finding of justiciability may be summarized thus: Plaintiff is now offering its product to customers who are worried about infringement liability in the United States. Although those customers have not been directly threatened by duPont, they have, arguably, felt the force of duPont's threatening posture. At the same time duPont became more adamant about its U.S. patent rights, Akzo reassessed its prior policy of refusing to indemnify Arnitel purchasers and has undertaken at least one negotiation that may result in an indemnification agreement although none has yet been consummated. The question for decision is whether this evidence of duPont's patent enforcement stance and Akzo's business interest represent a concrete clash of legal rights arising from U.S. product patents.

a. DuPont's Threats of Infringement Action

To find a genuine controversy, the Court must have evidence that defendant has asserted its patent rights by words or conduct that cause plaintiff reasonably to fear adverse action based on those patents. See, e. g., Dewey & Almy Chemical Co. v. American Anode, Inc., 137 F.2d 68, 70 (3d Cir.), cert. denied, 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943); Japan Gas Lighter Assoc. v. Ronson Corp., 257 F.Supp. 219, 237-43 (D.N.J.1966). In advancing the theory presently under discussion, Akzo claims that it labors under a threat of infringement litigation against customers who export to the United States articles containing Arnitel. The issue, then, is whether duPont has created a reasonable fear of such litigation. The Court finds that it has.
*365 Akzo's own fear of customer liability springs from the direct threat uttered in the May 5, 1980, meeting with duPont representatives.[19] The reasonableness of customers' apprehension of suit is more difficult to determine. The record shows no tendency on duPont' part to overt intimidation of Akzo's customers. Indeed, Dr. Stöhr testified that he knew of no threats to Arnitel users "by direct contact or message."[20] DuPont has, however, demonstrated by institution of foreign lawsuits that it believes Arnitel to be an infringing product and that it is willing to challenge the competition through litigation. Although the foreign actions in question are directed against Akzo itself, I hold that they are sufficient to create apprehension on the part of Akzo's customers.
This conclusion is dictated by the liberality of interpretation consistently observed in this Circuit. In a seminal case, jurisdiction was found where the only form of threat to plaintiff consisted of the patentee's suit of a different competitor for use of a different infringing process and a conversation in which defendant's agent informed plaintiff that it intended to "put a stop to" infringement. Dewey & Almy, supra, 137 F.2d at 69-70. Relying principally on the institution of the lawsuit, the court found that defendant had publicly asserted its patent rights, thereby creating a justiciable controversy. It was of no moment that there had been no direct threat to Dewey & Almy or that defendant denied knowledge of Dewey & Almy's intent to use an infringing process. The counterpart lawsuit made the patent an "economic weapon" against plaintiff because "customers and prospective customers may also be scared off by suits against other alleged infringers." Id. at 71.
Numerous cases restate the proposition that a justiciable controversy exists where the threat of infringement action is indirect and unspecific. See, e. g., Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America, 257 F.2d 485, 490 (3d Cir. 1958); Federal Telephone & Radio Corp. v. Associated Telephone & Telegraph Co., 169 F.2d 1012 (3d Cir.), cert. denied, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948); Ethicon, Inc. v. American Cyanamid Co., 369 F.Supp. 934, 937 (D.N.J.1973); Japan Gas Lighter Assoc. v. Ronson Corp., 257 F.Supp. 219, 238 (D.N. J.1966). Ethicon is particularly pertinent here. In that case, a justiciable controversy existed on the basis of defendant's suit in Great Britain against plaintiff's sister corporation for infringement of a British patent corresponding to a U.S. patent. "The suit in Britain constitutes ample notice both to plaintiff and to those with whom plaintiff does business, of an existing controversy." Ethicon, supra, 369 F.Supp. at 937.
The record in this case brings it within the line of precedent discussed above. As in Ethicon, foreign litigation has given notice that duPont considers Arnitel an infringing product sufficiently dangerous to warrant legal action. The instant case presents an even stronger claim to justiciability than Dewey & Almy. There, the other lawsuit concerned a process different from the one plaintiff planned to use, while in this case, customers are on notice that the very product they purchase is under attack. It is concluded that duPont created a threat that fulfills the first element of the justiciability test under a customer liability theory.

b. Probability that Arnitel Customers Will Enter the American Market

The inquiry does not end with this finding, however. This Court has unequivocally *366 held that "the most liberal interpretation of justiciability will not admit to an active controversy in the absence of either some imminent infringing conduct or some assertion of the same." Polaroid Corp. v. Berkey Photo, Inc., 425 F.Supp. 605, 609 (D.Del.1976). On the facts in this record, the Court cannot find that infringement by plaintiff's customers has taken place or is about to occur. The complaint alleges only that Akzo "is desirous" of establishing the rights of customers "who might wish to use these polymeric materials to manufacture finished articles for export to and/or sale or use in the United States."[21] There is no statement that Akzo has made or intends to make such sales or that any customers do or will export infringing articles to the United States. It is true that the record contains correspondence between Akzo and possible customers concerning the problem of indemnity for legal action in the United States.[22] The evidence does not, however, reveal that Akzo made or lost sales to these customers or that the customers actually intend to use their hypothetical purchases of Arnitel in exports to the United States. While the Court may justly draw the inference that potential customers would like to feel secure in entering the American market, there is no basis for an inference that they have a present intent to establish such commerce.
Polaroid clearly denies justiciability in these circumstances. That case is consonant with earlier holdings that the mere wish to enter a particular market does not constitute a concrete legal interest deserving of vindication by declaratory judgment.[23]See Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 439 F.2d 871 (1st Cir. 1971); Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87 (2d Cir. 1963); Blessings Corp. v. Altman, 373 F.Supp. 802, 805 (S.D.N.Y.1974); Atlas Imperial Diesel Engine Co. v. Lanova Corp., 79 F.Supp. 1002 (D.Del.1948).
As plaintiff points out, the courts often use broad language to describe the harm done by threatening customers. Such far-reaching dictum cannot support the conclusion that threats alone create a justiciable controversy, for the courts' language is generally qualified by some reference to the presence of actual or imminent infringement by the plaintiff or his customers. In Dewey & Almy, for example, the court expressed lively anxiety that customers might vanish in the face of infringement litigation. Dewey & Almy, supra, 137 F.2d at 71. Nevertheless, it also stated: "It is obvious that a person not now engaged in possible infringing conduct, and having no immediate intention of doing so, but having an academic interest in the law of patents, could not obtain a declaratory judgment." Id. at 70. Similarly, in Ethicon, the plaintiff whose sister corporation had been sued in England was held to have shown "compelling circumstances" favoring justiciability since it had already manufactured the infringing articles in the United States. Ethicon, supra, 369 F.Supp. at 939.[24]
In sum, the failure to allege or proffer facts indicative of the imminence of infringing *367 sales in this country prevents Akzo from coming into this Court on the theory that there is an actual controversy over its customers' right freely to enter the U.S. market.

2. Alternative Theories of Justiciability

Akzo's other theories of justiciability fare equally badly and may be disposed of much more briefly. This Court is in no position to rule on counsel's suggestion that jurisdiction may rest on Akzo's possible liability for inducing infringement by customers who sell Arnitel based products in the United States.[25] This theory of liability was neither briefed nor extensively developed at oral argument, nor is its legal basis sufficiently clear for the Court to accept it on its face. In any event, the theory suffers from the same lack of concreteness that destroys Akzo's major argument: there is no evidence of anyone's intent to sell in the United States.
Finally, Akzo claims that actual controversy beclouds its own right to sell Arnitel directly to American buyers. The complaint alleges that Akzo will pursue its business "in an even more intensive manner in the United States."[26] Plaintiff has also submitted letters from American manufacturers interested in purchasing or testing Arnitel[27] and evidence that a few samples of plaintiff's product have reached this country.[28] Apparently, the samples are few and did not constitute actual sales. Although some courts have been unwilling to find jurisdiction on the basis of "token" distribution of the infringing article,[29] these samples might, in combination with the complaint's statement of intent, establish Akzo's concrete stake in a patent validity trial were it not for other credible evidence that plaintiff lacks the definite intention to manufacture or sell in this country. In a June, 1979 meeting with duPont's representatives, René Sieders stated that "Akzo were not interested in rights to manufacture or sell the elastomers as such in the United States of America but wish to reserve the position so that European manufacturers of finished products incorporating the elastomers ... could feel secure that the products would be able to enter the United States without the threat of litigation."[30] Intentions may, of course, alter over time. That there has been no distinct alteration appears from the deposition testimony of a director of Akzo. Dr. Stöhr expressed the belief that no Arnitel had been sold in the U.S. and that the problem of American sales was the concern of customers rather than of Akzo itself.[31] In the face of contradictory evidence of intent, the Court cannot conclude that plaintiffwho bears the burden of proving jurisdictional facts[32]has established a concrete legal interest in determination of duPont's U.S. patents' validity.
The short answer to all proffered theories of justiciability lies in the flimsiness of the evidence that Arnitel will shortly become a competitor in the American market. The evidentiary weakness cannot diminish the fact that U.S. patents exert considerable economic effect on the European competition *368 between duPont and Akzo.[33] As this Court held in Polaroid, however, a conflict of economic interests does not necessarily signify adversity of legal rights. Polaroid, supra, 425 F.Supp. at 609. See Aralac, Inc. v. Hat Corp. of America, 166 F.2d 286, 295 (3d Cir. 1948); E. Borchard, Declaratory Judgments 53 (2d ed. 1941). Just as the patentee's right to a monopoly under an American patent stops at the frontier, so a competitor's right to be free of coercion by invalid patents is a legal force only when it competes in the American market. On the record before this Court, no clash of legal rights has yet arisen.
The complaint in Civil Action No. 80-359 will be dismissed.

IV. ENKA
Enka B.V. of Arnhem, Holland ("Enka"), stands in much the same relation to defendant duPont as does Akzo. Enka is a Dutch subsidiary of the European chemical concern that also encompasses Akzo. Enka manufactures "Arenka," an industrial aramid fiber used in such products as automotive tires. The complaint alleges sufficient similarity between Arenka and duPont's patented "Kevlar" to create a possible problem of infringement.[34] It is also averred that duPont has declined to enter into licensing arrangements with Enka and threatened suit to protect the Kevlar patent estate.[35]
The Enka case differs from Akzo's in the extent of plaintiff's current development: The European operation is considerably smaller than Akzo's, but it's American contacts are more extensive. Enka's current production is relatively slight, being limited to the output of a Dutch pilot plant not now operating at full capacity. Plaintiff is attempting to obtain funds for commercial-scale plants. However, it is undisputed that these plans depend on the Dutch government's willingness to participate in the venture to the extent of more than $50,000,000.[36] At present, there are no plans to manufacture Arenka in the United States.[37]
Despite its small size, Enka has made overtures to potential American customers.[38] Shipments of Arenka samples have come into this country since 1975. These shipments total about 640 pounds, of which over half went to one purchaser, the remainder being distributed to a number of interested companies.[39] Enka claims that its plans to expand American sales activities are blocked by duPont's holding and use alleged misuseof the patents in suit.[40] Consequently, plaintiff wishes to challenge six of duPont's U.S. patents for the fiber itself and related manufacturing processes.
The inquiry into justiciability of Enka's suit will follow the pattern set above.[41] The Court first considers whether the claims arise under federal law; second, whether Enka has shown that it reasonably fears infringement actions by duPont; third, whether Enka has the immediate intent and ability to undertake arguably infringing conduct.

A. Does the Case Arise Under the Patent Laws?

Enka seeks a judgment declaring the invalidity and unenforceability of a *369 number of U.S. patents protecting duPont's Kevlar. Although the briefs did not explore this issue, it appears one or more of the patents could be process patents.[42] Since Enka does not now manufacture in the United States and has no intention of doing so in the immediate future, any U.S. patents relating strictly to the production of Kevlar are not implicated in Enka's current activities. The reasoning employed in dismissing certain of Akzo's claims must apply here.[43] Disregarding further case or controversy questions, this Court could take jurisdiction only over the product patents that duPont might plausibly claim to be infringed by Enka's exports to the United States.

B. Is There a Case or Controversy?

1. Threats of Infringement Action

The submissions of both parties establish that Enka passes one phase of the test for subject matter jurisdiction: Enka had a reasonable apprehension of a duPont lawsuit based on the U.S. patents at issue. In his affidavit Donald A. Hoes, a duPont patent attorney, avows that "[d]efendant has told Enka of its intention to protect its patent rights relating to aramid fibers in those countries where it has such patents when and if Enka becomes commercial in such country." The affiant further acknowledges that duPont has sued Enka in several European countries on the basis of counterparts of the U.S. patents.[44] DuPont's communication of its "intention" is recorded in an internal memorandum of a 1977 meeting with Enka representatives in which "[w]e told them we expected to defend these patents at all stages and in all countries."[45] A more specific reference to enforcement of U.S. patents was made in a discussion between a duPont representative and one Arenka purchaser in the U.S. The purchaser was advised "that a question exists as to whether `Arenka' fiber infringes on certain Du Pont patents and that we are closely following `Arenka' activity worldwide and especially in the U.S. I added that we would take appropriate action to protect Du Pont patents."[46]
This history of threatened litigation on U.S. patents, backed up by the contemporaneous example of suits on foreign counterpart patents, amply justifies Enka's claim that it has a reasonable apprehension of infringement litigation. Indeed, comparable cases indicate that a less fully-documented showing would be adequate. See, e. g., Treemond Co. v. Schering Corp., 122 F.2d 702 (3d Cir. 1941) (advertisement in trade magazine stating that declaratory judgment defendant intended to protect its patent rights was sufficient threat to support jurisdiction); Ethicon, Inc. v. American Cyanamid Co., 369 F.Supp. 934 (D.N.J. 1973) (suit on foreign counterpart patent sufficient threat).
Defendant argues that the threat it acknowledges is merely to sue "when and if Enka becomes commercial" in the U.S.[47] Alleging that Enka's American activities are not on a "commercial" scale, duPont claims that Enka cannot reasonably regard itself as threatened. This argument runs counter to the purpose of the Declaratory Judgment Act. DuPont cannot claim that threats limited to "commercial" activity do not create actual controversy and, at the same time, rely on those threats to prevent "commercial" activity.[48] Were this Court *370 to hold that Enka cannot challenge duPont's patents until it establishes a level of American business that duPont considers to be "commercial," Enka would be gored by the horns of the very dilemma the Act was intended to tame. It would be stymied by arguably invalid patents that could only be challenged at the risk of losing a substantial investment. See, e. g., Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87, 89-90 (2d Cir. 1963); Girdler Corp. v. E. I. duPont de Nemours & Co., 56 F.Supp. 871, 875 (D.Del.1944). In a similar context, the First Circuit Court of Appeals found that plaintiff had shown itself reasonably apprehensive of suit although it had received from defendant a letter explaining that infringement had not yet been charged because defendant had not "`felt' the effect" of plaintiff's activities. The Court reasoned that plaintiff might well fear to pursue its plans in view of the possibility that defendant would "feel" its competition and sue. Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 439 F.2d 871, 874 (1st Cir. 1971). DuPont's argument is rejected. The Court finds that Enka has reason to anticipate legal action based on duPont's U.S. patents.

2. Enka's Intent and Capacity to Enter the American Market

Enka's case falters at the issue of its intent and capacity to undertake infringing sales in the United States. Enka first argues that its present level of activity  based on the pilot plant's productionis sufficient to show existing controversy in the United States as well as the intent and capacity to increase American sales. It then points to the plans for future commercialization to support the need for immediate relief.
Enka's current position will be examined first. This opinion has already touched on some of the relevant facts. To recapitulate, plaintiff operates a small pilot plant in Holland. It has distributed Arenka samples to a number of U.S. companies and made at least one sale.[49] Plaintiff alleges that it intends to continue and expand American commerce.[50] The allegation finds some support in Enka's maintenance of an independent sales representative in the United States.[51]
In order to hold that Enka faces actual controversy with duPont, this Court must find that plaintiff has serious and immediate plans to undertake the infringing activity sale in the United States.[52]Super Products Corp. v. D P Way Corp., 546 F.2d 748 (7th Cir. 1976); Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 439 F.2d 871 (1st Cir. 1971). "Token" sales or production of an experimental model will not be sufficient. Sweetheart Plastics, supra, 439 F.2d at 872; Wembley, supra.
Under this standard, plaintiff's arguments must fail. The shipments over five years total only 640 pounds. These are mere tokens, not indicative of a genuine market presence in this country.[53] Further, *371 there is no reason to believe that the token sales will increase. Although Enka has demonstrated its interest in the American market, it has shown neither intent nor capacity to devote a significant amount of the pilot plant's production to U.S. purchasers. There is testimony that the pilot plant could increase production up to 500,000 pounds a year by working on a round-the-clock, four-shift schedule. This potential for expansion of the existing facility remains strictly hypothetical for Enka has not actually used or planned such a schedule.[54] Even assuming Enka's current capability of supplying a substantial U.S. order, there is no evidence that it has the present intention of doing so. No large American offers have been accepted.[55] Moreover, the deposition testimony indicates that Enka's principal target is the European market. Dr. Stöhr acknowledged that the pilot plant's capacity would be strained if it had to fill a large U.S. order while supplying its European customers as well.[56] In sum, plaintiff's claim that the pilot plant can and will supply a significant U.S. demand is severely undercut by its failure to make that effort during five years of dealings with American companies and by the apparently conflicting demands of the European market. Enka's efforts in this country amount to no more than testing the commercial waters. There is nothing to suggest that it will immediately take the plunge if the Court overturns duPont's U.S. patents.
Plaintiff points out that some courts have found justiciable controversy where commercial-scale infringement had not yet occurred. Those cases are distinguishable from the present circumstances, however, in the extent to which those plaintiffs had prepared to enter the American market. In Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America, 257 F.2d 485 (3d Cir. 1958), not only had the British plaintiff previously exported "substantial quantities" of the disputed device, but, just prior to the lawsuit, 143 drums of the product were withdrawn from the United States after being seized at Customs. The volume of Simmonds' exports showed that it was a far more serious competitor in the American market than is Enka. Other cases in which pre-commercial activities were held to create actual controversy all involve plaintiffs who had built prototypes and commenced testing and sales promotions in the United States. See Super Products, supra; Sherwood Medical Industries, Inc. v. Deknatel, Inc., 512 F.2d 724 (8th Cir. 1975); Ethicon, Inc. v. American Cyanamid Co., 369 F.Supp. 934 (D.N.J.1973). In each of these cases, there was no doubt that production was ultimately intended for a U.S. market. Enka, by contrast, has conducted its pilot project in Europe with only the most tentative incursions into the United States and no clear plans for a more substantial invasion. These cases do not stand in the way of holding that no actual controversy appears from the facts alleged here.
The final issue is whether Enka's plans to build commercial-scale Arenka plants can fulfill the case or controversy requirement. Having found that Enka's current position fails to support subject matter jurisdiction, the Court must conclude that future prospects also fail. The plan for a joint venture in commercialization calls for very substantial participation by the Dutch development agency, NOM. According to a member of plaintiff's board of directors, NOM's participation is a condition precedent to commencement of the plan. The agency has yet to decide whether it will undertake the investment.[57] To add to the uncertainty, Enka and its allied companies have not completed plans for *372 financing their side of the joint venture.[58] The success of the joint venture is too uncertain of occurrence to warrant the inference that Enka has the immediate intent and capacity for significant infringing sales in the United States. Cf. Sweetheart Plastics, supra, 439 F.2d at 875 (fact that plaintiff's plans for development depended on outcome of parallel lawsuit made such plans too indefinite to be justiciable).
The Court concludes that plaintiff's current level of American business and its hopes for the immediate future do not meet the jurisdictional requirement of the Declaratory Judgment Act. Further, it appears that this is an appropriate case for exercise of the district judge's discretion to decline declaratory judgment jurisdiction. See Public Affairs Assoc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); Stamicarbon, N.V. v. Chemical Construction Co., 355 F.Supp. 228 (D.Del.1973). Where the evidence of plaintiff's plans for serious business in the United States is so equivocal, there is no assurance that judgment will effect a tangible change in the parties' affairs rather than merely serve as an advisory opinion to be filed for future reference. To avoid the latter, prohibited result, the Court invokes its discretion. See Dr. Beck & Co. v. General Electric Co., 317 F.2d 538, 539 (2d Cir. 1963).

V. CONCLUSION
The two cases before this Court test the limits of justiciability in the declaratory judgment context. Examination of the facts has led to the conclusion that controversy over duPont's U.S. patents has not yet crystallized. Plaintiffs have not shown the genuine stake in the American market that would vest in them the right to compete free of constraint by invalid patents. Absent a concrete legal interest in the result, plaintiffs cannot state an actual controversy of which this Court may take cognizance. Accordingly, an order will be entered dismissing the complaints without prejudice.
NOTES
[1] Mortensen itself departed from the standard just quoted. The appellate court reversed a trial judge's jurisdictional dismissal that had been granted on the basis of the analysis that will be used here. The Third Circuit Court of Appeals found this analysis appropriate in the usual factual challenge to jurisdiction, but not in Mortensen because plaintiff had had no clear opportunity to be heard on the jurisdictional facts and because those facts were also crucial to its case on the merits. 549 F.2d at 892, n. 18. Since these two distinguishing factors are not present here, the usual rule identified in Mortensen should apply.
[2] In this respect, too, this case differs from Mortensen. There the court stated that filing of an answer should precede jurisdictional factfinding because it is necessary that plaintiff's allegations be controverted. Mortensen, supra, 549 F.2d at 892, n.17. Here no answer has been filed, but plaintiffs' jurisdictional claims are controverted in defendant's motions and the issues have been joined by submissions from both parties. It is well established that if the plaintiff's "allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof." McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) [emphasis supplied].
[3] At oral argument both counsel agreed "that the Complaint must be tested for justiciable controversy as of the time it was filed, but that later written documents can be used to evidence the plaintiff's intent at the time of filing." Transcript at 43. The date of the original complaint is adopted because the amendments, filed October 24, 1980, in no way concern any issues briefed on these motions and discussed by the Court.
[4] The provision reads in full:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954 or a proceeding under section 505 or 1146 of title 11, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2201.
[5] See Affidavit of James T. Corle in Support of Defendant's Motion to Dismiss Plaintiff's Complaint at 2. (Doc. No. 16).
[6] (a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws.
28 U.S.C. § 1338.
[7] See Stohr deposition at 87-89.
[8] Akzo also has argued that jurisdiction may be predicated on 19 U.S.C. § 1337 and 1337a, provisions of the customs law that could permit duPont to seek exclusion of imports made abroad by processes patented in the United States. This statute, however, confers jurisdiction not upon a federal district court, but upon the United States International Trade Commission, empowering it to investigate and prevent importation of articles made by an infringing process which significantly damages United States industry. It is true that section 1337a explicitly confers the status of "unfair competition" on certain importations of products made by U.S. patented methods. That statute does not extend the reach of the patent laws generally. It defines unfair competition only "for the purposes of section 1337," thus broadening the jurisdiction of the USITC, but not that of a federal district court.
[9] Stöhr deposition at 89. The exact extent of Arnitel production appears in the sealed portion of Dr. Stöhr's deposition at 7-8.
[10] Sealed Appendix to Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss (Doc. No. 26A) at A37 & A41-43 [hereinafter "Akzo Appendix"].
[11] Akzo Appendix at A44.
[12] Akzo Appendix at A40.
[13] Akzo Appendix at A41-43.
[14] No finalized agreement appears in the Appendix. At oral argument, counsel for Akzo stated that he knew of no existing agreement. Transcript at 52.
[15] Akzo Appendix at A32 (minutes of June 15, 1979 meeting).
[16] Id. at A35.
[17] On February 12, 1980, duPont's James T. Corle wrote to Akzo's René Sieders:

In my letter of September 7, 1979, I mentioned that we were having difficulty formulating terms for settling our various patent conflicts. The situation was complicated by parties other than Akzo joining in the same opposition. It has now become more complicated by your company's filing additional oppositions and the introduction of a complete line of products in apparent disregard of Du Pont's patent rights in a number of countries.
Du Pont has spent millions of dollars on research and market development in this field, and has obtained a number of patents protecting this development. We do not plan to grant licenses under these patents at this time.
Akzo Appendix at A25.
[18] Affidavit of W. H. Meyberg, General Manager of Akzo. Akzo Appendix at A27.
[19] Id. Meyberg's statement that the threat was made goes unchallenged. DuPont's only response to the claim was a post-argument affidavit averring that it has not been duPont's practice to sue customers of infringers. Affidavit of Robert C. Kline. (Doc.No.31). This description of a general policy does not undercut the sworn statement that, on one occasion, there was a threat to break with that policy.

Kline's affidavit dated December 16, 1980, was filed in response to the Court's questioning at oral argument. It is considered only to the extent that it purports to describe duPont's intentions at the time the complaint was filed. This decision is consistent with the ruling that jurisdiction must be determined as of the filing date. See supra at 3.
[20] Stöhr deposition at 90.
[21] Complaint at ¶ 8 [emphasis supplied].
[22] Akzo Appendix at A37-41.
[23] Cases upholding jurisdiction where customer sales were threatened are not to the contrary. In each such case, plaintiff or his customers had either undertaken the infringing activity or alleged definite preparations to do so. See, e. g., Grafon Corp. v. Hausermann, 602 F.2d 781 (7th Cir. 1979) (plaintiff had manufactured infringing machines for several years); Alfred Hofmann, Inc. v. Knitting Machines Corp., 123 F.2d 458 (3d Cir. 1941) (infringing machines were in use by plaintiff's customer); Girdler Corp. v. E. I. duPont de Nemours & Co., 56 F.Supp. 871 (D.Del.1944) (plaintiff already made and sold to U.S. customers machines whose use allegedly infringed defendant's process patent).
[24] Similar circumstances appear in other patent cases urging liberal recourse to the Declaratory Judgment Act. See Super Products Corp. v. D P Way Corp., 546 F.2d 748 (7th Cir. 1976); Sherwood Medical Indus. v. Deknatel, Inc., 512 F.2d 724 (8th Cir. 1975); Treemond Co. v. Schering Corp., 122 F.2d 702 (3d Cir. 1941); Japan Gas Lighter Assoc. v. Ronson Corp., 257 F.Supp. 219 (D.N.J.1966).
[25] See Transcript at 51-55.
[26] Complaint at ¶ 31.
[27] Akzo Appendix at A45, A54-58.
[28] Id. at A45 & A59. In addition to the indication that Arnitel samples have been used by at least one American manufacturer, the correspondence at A46-51 suggests that Akzo and that manufacturer are in the process of negotiating an agreement for direct American marketing by Akzo. Since the evidence contains no hint at the outcome of these negotiations, it does not show the imminence of arguably infringing sales in this country.
[29] See Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc., 439 F.2d 871 (1st Cir. 1971); Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87 (2d Cir. 1963). But see Super Products Corp. v. D P Way Corp., 546 F.2d 748 (7th Cir. 1976).
[30] Akzo Appendix at A32.
[31] Stöhr deposition at 89.
[32] See discussion supra at 2.
[33] Consider, for example, a duPont internal memorandum on Hytrel's foreign competitors. Akzo Appendix at A173.
[34] Complaint at ¶ 21. Confidential documents produced during discovery and submitted under seal by Enka convince the Court that duPont agrees with the plaintiff's allegation that Arenka may be covered by the duPont patents. See sealed Appendix to Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint at A43 & A50. (Doc.No.26A) [hereinafter "Enka Appendix"].
[35] Complaint at ¶¶ 9 & 10.
[36] See Stöhr deposition at 34-37; Affidavit of Donald A. Hoes in Support of Defendant's Motion to Dismiss Plaintiff's Complaint at 3. (Doc.No.18).
[37] See Stöhr deposition at 27.
[38] See Enka Appendix at A25.
[39] See Stöhr deposition at 24-27; Exhibit I attached to sealed Stipulation of December 16, 1980. (Doc.No.31).
[40] Complaint at ¶¶ 21-23.
[41] See supra at 3-5.
[42] Complaint at ¶ 14 (specifying Patent No. 3,767,756, entitled Dry-Jet Wet Spinning Process).
[43] See supra at 6-8.
[44] Affidavit at 2.
[45] Enka Appendix at A27. Many of the documents speak of Akzo rather than Enka as the maker of Arenka. The reference comes from the fact that Akzo N.V. (not Akzo, B.V., plaintiff in the allied action) is the parent of Enka B.V.
[46] Enka Appendix at A50.
[47] Hoes Affidavit at 2.
[48] Documents recording the 1977 discussion between duPont and Akzo/Enka representatives and a 1979 talk given by a duPont spokesman before the Dutch body currently considering a joint venture in Arenka make clear that duPont has publicly relied on its patent strength to discourage Enka. See Enka Appendix at A28 & A43-46. This finding should not be taken to imply wrong-doing on duPont's part. It merely shows that a substantial threat exists.
[49] Stöhr deposition at 26-27; Exhibit I to sealed Stipulation of December 16, 1980.
[50] Complaint at ¶ 23.
[51] Stöhr deposition at 72-76. Working out of the North Carolina headquarters of another subsidiary of Enka's parent company, Akzo, N.V., this representative has some contacts with U.S. purchasers. Evidently he does not make actual sales; these are handled by a European Product Group.
[52] This analysis differs from that in Akzo's case because different theories of justiciability were advanced. Akzo relied primarily upon the potential for U.S. sales by its European customers, while Enka asserts its own American dealings as a jurisdictional basis.
[53] To appreciate the slightness of Enka's American sales, compare the 640 pounds of Arenka with the production capacity of duPont's Kevlar plant, 15,000,000 pounds per year. (Hoes Affidavit at 2). Although the record does not permit precise comparison of the parties' U.S. sales, the figure cited supports the inference that 640 pounds over five years is a minuscule contribution to the American aramid fiber industry.
[54] Stöhr deposition at 27-30; sealed portion of Stohr deposition at 6.
[55] Stöhr deposition at 25-26. After the filing of this complaint, an American concern made inquiries about the possibility of purchasing quantities of Arenka in the 100-500,000 lbs./yr. range. See Exhibits G & H to Stipulation of December 16, 1980; sealed portion of Stohr deposition at 10-12. Enka has submitted no evidence of the outcome of this inquiry.
[56] Stöhr deposition at 38.
[57] Stöhr deposition at 34-37; sealed portion of Stohr deposition at 8-10.
[58] Stöhr deposition at 45; sealed portion of Stöhr deposition at 10.